Present: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ., and Compton, S.J.

CHARLES DOUGLAS RINER

v. Record No. 031299  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        September 17, 2004
COMMONWEALTH OF VIRGINIA

            FROM THE COURT OF APPEALS OF VIRGINIA


     Charles Douglas Riner ("Riner") was convicted by a

jury of the first degree murder of his wife, Karen Denise

Riner ("Denise"), in violation of Code § 18.2-32; of arson,

in violation of Code § 18.2-77; and of petit larceny in

violation of Code § 18.2-96.  The Court of Appeals of

Virginia affirmed the convictions and the judgment of the

Circuit Court of Wise County ("the trial court").  Riner v.

Commonwealth, 40 Va. App. 440, 479, 579 S.E.2d 671, 691

(2003).

     We awarded Riner this appeal on six assignments of

error.[1]  He challenges the denial of his motion for a change

of venue, the denial of his motion for a mistrial because

of alleged jury misconduct, the use of a "private

prosecutor," the admission of double hearsay testimony

concerning a threat he made to his wife, the admission of

certain business records because the Commonwealth failed to

_____

     [1] The petit larceny conviction is not before us in this
appeal.

show that the entrant was unavailable to testify, and the sufficiency of the evidence to support the arson conviction. We also awarded an appeal on the Commonwealth's two assignments of cross-error. Finding no error, we will affirm the judgment of the Court of Appeals.

## I. RELEVANT FACTS[2]

In accordance with established principles of appellate review, we state the facts in the light most favorable to the Commonwealth, the prevailing party in the trial court. We also accord the Commonwealth the benefit of all inferences fairly deducible from the evidence. Armstrong v. Commonwealth, 263 Va. 573, 576, 562 S.E.2d 139, 140 (2002); Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). Circumstantial evidence, when sufficiently convincing, is entitled to the same weight as direct evidence. Derr v. Commonwealth, 242 Va. 413, 424, 410 S.E.2d 662, 668 (1991); Epperly v. Commonwealth, 224 Va. 214, 228, 294 S.E.2d 882, 890 (1982).

## A. THE FIRE

In the early morning hours of August 12, 1998, Larry Odle, who lived next to the Riners in the Town of Coeburn in Wise County, saw flames coming from the Riner house.

---

[2] We will recite additional facts relevant to particular assignments of error.

Odle walked outside to investigate the fire and observed a "shadow or reflection . . . peek around the [left] corner" of the Riner house three or four times.  A person then emerged from that corner and yelled "help, help, my house is on fire."  Odle returned to his house and called the "911" emergency number.  He then went back to the site of the fire and saw Riner walk from the same left corner of the burning house carrying two of the Riner children.[3]

One of the first three police officers to arrive at the scene stated that, when he got there, the fire was "basically still in the lower part of the house . . . and it was crawling across the [front] porch area and coming out the other side where the top part of the house was on fire."  When that officer exited his police vehicle, he observed Riner and two small children coming around the left corner of the house.[4]  The officer approached Riner and asked if anyone else was in the home.  Riner did not respond and, in the officer's opinion, "[s]eemed surprised that someone was there."  The officer repeated his

---

[3] During their eight-year marriage, the Riners had three children.  Denise also had a son by a previous marriage.  That son was not at the Riner house when the fire occurred.

[4] The Riners' third child was already out of the house. Riner told one of the police officers that he had sent that child to call the fire department.

question, but Riner again did not answer.  Only after two of the officers approached the burning house did Riner inform the third officer that his wife was still inside their home.  Two of the officers then kicked opened a door on the rear of the house, but they could not go inside more than two or three feet because of the intense smoke and heat.

The fire consumed the second floor and roof of the Riner house as well as the front porch, including the floor and the "uprights" of the porch.  There was also extensive damage throughout the interior of the first floor, including the master bedroom where Denise's body was found.[5] There and elsewhere on the first floor of the house, fire investigators discovered piles of paper that had been torn apart lengthwise.  Some of the torn paper came from correspondence or publications belonging to Riner.

According to the forensic pathologist who performed an autopsy on Denise's body, Denise died from smoke inhalation, which is determined by looking in the airways for "soot" and "black material" and measuring the carbon monoxide level in the blood.  The forensic pathologist stated that Denise's body had been "incinerated."  Her

---

[5] The master bedroom was located at the front of the house on the right, as viewed from the main road.

4

skin, muscles, facial features, scalp, arms and legs had been burned. Because of the extensive burning of her body, the forensic pathologist could not determine whether Denise had suffered other injuries or had been rendered unconscious by some other trauma before her death. However, the forensic pathologist did not find any evidence of blunt force or penetrating injuries to Denise's body. Although a partially burned baseball bat was found near her body, the forensic pathologist could not put that bat "in or on the body."

On the night of the fire, Riner claimed that he was upstairs, asleep in a room with the three Riner children. However, the family's housekeeper testified that she did not remember anytime that all three children had slept upstairs or in the same bed with Riner. Riner also admitted that the children normally slept downstairs in a bed with Denise.

Riner testified that, when he awoke and smelled smoke, he looked toward the rear of the house and saw smoke coming up the steps. He stated that the smoke was so intense that he could barely breathe and that his eyes were burning so badly that he could not see. However, he was able to find the three children, help them out a window onto the rear porch roof, and then lower them to the ground. Although

Denise died from smoke inhalation, Riner did not have any symptoms consistent with carbon monoxide intoxication or carbon monoxide poisoning upon examination at a local emergency room on the morning of the fire. The forensic pathologist testified that, if smoke from a fire is very dense, a person could breathe in a lethal level of carbon monoxide within seconds. Additionally, a nurse who checked Riner in the emergency room did not observe any soot on him or smell any smoke about his body. Riner did, however, have a low oxygen level based on an arterial blood gas study, which was consistent with a sudden or acute injury to his airway from inhaling smoke.

B. RINER'S ACTIVITIES PRIOR TO AND AFTER THE FIRE

Two issues caused recurring disagreements between the Riners during their marriage. One of those issues concerned Riner's discipline of Denise's son by her previous marriage. In the early part of August 1998, Denise learned that Riner had choked and slapped her son at a family reunion. That incident exacerbated the Riners' already existing marital difficulties, causing Denise to meet with an attorney on August 4 to obtain information about divorce proceedings. The next day she opened a checking account in her own name. On August 7, she confronted Riner with her knowledge about his abuse of her

6

son and demanded that he move out of the marital residence. Riner apparently agreed to move on the following weekend, which would have been the weekend immediately after the fire. However, he told one of the fire investigators that Tuesday night, August 11, 1998, was to be his last night in the marital home.

The other subject causing disagreement was the couple's financial condition. Within a week after the Riners were married in 1990, Riner quit his job. Throughout the marriage, Denise, a nurse, provided the primary financial support for the family.

By mid-1998, Riner had pressing financial difficulties. He had incurred several substantial debts and was delinquent in some of his financial obligations. In particular, Riner had agreed to make restitution in the amount of approximately $5,400 by October 1998 as a condition of probation in a federal pre-trial diversion program in which he was participating. Due to his failure to pay the restitution as scheduled, Riner still owed about $2,900 as of June 1998 and was therefore facing the possibility of being prosecuted on federal bank fraud charges. In fact, he was scheduled to meet with his federal probation officer on August 12, 1998, the day of the fire. The probation officer had also learned that

7

Riner had two outstanding criminal charges, one a misdemeanor and one a felony, for having issued two checks for which there were insufficient funds to pay the checks.

After Denise's death, Riner collected approximately $8,500 from Denise's employer and then paid the restitution in full. Riner insisted, however, that he paid the federal restitution with money he had received from selling two vehicles. He also paid the indebtedness owed to a local merchant for the two checks that were returned for insufficient funds.

Riner also filed two insurance claims. One was a fire insurance claim in the amount of $186,820.24, of which the sum of $116,453.00 was for personal property. The second claim was on a group life insurance policy provided to Denise by her employer. In anticipation of receiving funds from those claims, Riner purchased a used Mercedes automobile by borrowing $9,000 on a 30-day single payment note. He also relocated himself and the three Riner children to eastern Tennessee and made an offer to purchase a house there for the price of $169,000.

The day before the fire, a neighbor observed Riner storing three trash bags in a building located apart from the Riner house. In March 1999, Riner sold jewelry at a pawn shop located in Bristol, Tennessee. Denise's sisters

8

subsequently accompanied a police officer to the pawn shop and identified three rings found there as belonging to Denise.  The rings were part of the jewelry Riner sold, and the Commonwealth introduced evidence showing that the rings would have been damaged or destroyed if they had been in the Riner house during the fire.  One of the rings came from Denise's great-grandmother.  Another ring was a diamond anniversary band that Denise wore daily and was, in fact, wearing on the day prior to her death.  The third ring was a pearl ring that Denise had received as a birthday gift from her co-workers at her place of employment.

## C. RINER'S ARREST

In November 1999, Riner told his employer and personnel at his children's schools that he and the children would be traveling to Pennsylvania to attend a funeral.  Instead, Riner spent about 19 days traveling around to different destinations in the United States and then flying to Panama.  The flight out of the country occurred at a time when the police investigation into the fire and death of Denise was nearing completion and Riner remained a prime suspect.  In fact, Riner was indicted for

9

first degree murder and arson on January 18, 2000.[6]  Riner
was arrested in Panama on January 21, 2000.  At that time,
he had in his possession clothes, documents, and luggage
that had been in the house prior to the fire.

## II. ANALYSIS

### A. CHANGE OF VENUE

Prior to trial, Riner moved for a change of venue,
asserting that he could not receive a fair trial in Wise
County because of prejudicial pre-trial media coverage of
the case.  After an ore tenus hearing, the trial court took
the motion under advisement and allowed the parties to
submit affidavits from Wise County citizens regarding the
change of venue issue.  After hearing additional argument
on Riner's motion, the trial court again took the motion
under advisement, stating from the bench that, if selecting
a jury "becomes a problem, then we will change the venue."
Riner did not object to the court's decision to do so.

At the conclusion of juror voir dire, the trial court
asked, "Any motions by counsel before we take a short break
and come back and select the jury?"  Counsel for Riner
responded, "No, Your Honor."  However, before the parties
exercised their peremptory strikes, a dispute arose

---

[6]  A September 1, 2000 superseding indictment charged
Riner with capital murder, arson, and robbery.

concerning whether the Commonwealth would introduce the fact of Riner's trip to Panama as evidence of flight. Riner indicated that he wished to counter any such evidence suggesting flight by mentioning in opening statement and by introducing into evidence the fact that he had passed a polygraph test. Riner asserted that the successful polygraph result directly influenced his decision to travel to Panama. Riner took the position that, by introducing evidence about the trip and the polygraph test, he could demonstrate that he had a legitimate reason for going to Panama, which would rebut adverse media publicity about the trip. During the course of the colloquy with the trial court about these issues, the court stated:

> Well, you know, there's no proof that these jurors know about the flight, but down deep in my little heart and my conscience, I know dang good and well they probably know or some of them, if not all of them, some of them know about it and I have a hard time ignoring that fact. I can't ignore it.

In response to the trial court's comment and out of concern that a ruling by the court to admit the polygraph evidence would be tantamount to a finding that the jury was not impartial, the Commonwealth stated that, if the trial court intended to admit evidence about the polygraph because of its perceived "taint in the community," then the Commonwealth was prepared to join in Riner's motion for a

change of venue. Riner initially disagreed with the basis of the Commonwealth's motion, but he ultimately joined in the motion. At no point during the discussion about the Commonwealth's motion for a change of venue or when Riner joined in that motion did he reiterate or rely upon his previously stated reasons for a change of venue. The trial court overruled the motion.

The parties then exercised their peremptory strikes without any further motions or discussion. The next morning before the jurors selected to hear the case were sworn, the trial court asked, "Any preliminary motions before we bring in the [j]ury?" Counsel for Riner stated, "None from the defense." The 12 jurors and 3 alternates were then sworn to try the issues joined between the Commonwealth and Riner.

As presented on appeal, Riner's assignment of error challenging the trial court's denial of a change of venue is three-fold. He argues that the trial court applied an improper legal standard because it considered only the fact that a jury had been selected rather than "the ease of seating the jury" as required by our decision in Thomas v. Commonwealth, 263 Va. 216, 232, 559 S.E.2d 652, 661 (2002). Next, he asserts that prejudicial pre-trial publicity prevented the selection of an impartial jury and that the

12

trial court therefore erred in denying his change of venue motion. Finally, he says that the trial court erred in denying the Commonwealth's change of venue motion, joined in by Riner, because the court itself questioned the impartiality of the jury.

With regard to Riner's assertion that the trial court applied an incorrect legal standard, the Court of Appeals concluded that Riner had defaulted this portion of his argument. Riner, 40 Va. App. at 457, 579 S.E.2d at 679. Riner did not argue before the trial court that it had applied an improper legal standard when considering the change of venue motion nor did he object when the court stated, "I hate to say that I told you so, but we got a jury now." Applying Rule 5A:18, the Court of Appeals thus held that this aspect of his challenge to the trial court's refusal to change venue was barred. Id. at 456-57, 579 S.E.2d at 679.

In his assignment of error to this Court with regard to the change of venue issue, Riner states only that the "Court of Appeals erred in affirming the trial court's erroneous denial [of] Riner's motion for change of venue and a joint motion for change of venue." Riner does not challenge that portion of the judgment of the Court of Appeals barring his argument that the trial court used the

13

wrong legal standard.  Thus, under Rule 5:17(c), we do not consider the issue.  See Burlile v. Commonwealth, 261 Va. 501, 507-08, 544 S.E.2d 360, 363 (2001).  We also find no reason to apply the "ends of justice" exception as requested by Riner.

We further conclude that Riner defaulted his challenge to the trial court's denial of his change of venue motion in which he asserted that he could not receive a fair trial because of adverse pre-trial media coverage of the case. When voir dire of the jury was completed, the trial court asked counsel for the parties whether there were any motions.  Riner's counsel specifically stated, "No, Your Honor."  Riner did not renew his change of venue motion at that point or remind the trial court that it previously had taken the motion under advisement.  Nor did he do so before the parties exercised their peremptory strikes or before the 12 jurors and 3 alternates selected to hear the case were sworn.

The posture of Riner's change of venue motion is analogous to the situation in Green v. Commonwealth, 266 Va. 81, 580 S.E.2d 834 (2003).  There, the defendant, like Riner, had filed a pre-trial change of venue motion.  Id. at 93, 580 S.E.2d at 841.  The trial court took the motion under advisement, and the defendant did not object to the

14

court's doing so. Id. The defendant did not renew the motion or remind the court that it was still pending at any time, including after the jury panel had been qualified or before the parties exercised their peremptory strikes. Id. at 93-94, 580 S.E.2d at 841-42. Because the defendant did not object to the trial court's decision to take the change of venue motion under advisement pending outcome of voir dire, we held that it was "incumbent upon [the defendant] to renew the motion before the jury was empanelled and sworn, or at least remind the court that it was still pending and that he wanted the court to rule on it." Id. at 94, 580 S.E.2d at 842. Thus, we held that the defendant had waived his change of venue argument under Rule 5:25. Id. at 95, 580 S.E.2d at 842.

We reach the same conclusion here. Like the defendant in Green, Riner did not object to the trial court's decision to take the change of venue motion under advisement. Thus, it was incumbent upon him to renew that motion or remind the court that it was still pending at some point before the jurors selected to hear the case were sworn. Since he failed to do so, Riner's argument for a change of venue because of pre-trial publicity is waived. See Rule 5:25.

Consequently, the only aspect of the change of venue issue properly before this Court is Riner's challenge to the trial court's denial of the Commonwealth's change of venue motion joined in by Riner. However, the reason for that motion was narrow. The Commonwealth wanted a change of venue only if the trial court, concerned that some of the jurors probably knew about Riner's trip to Panama, intended to allow Riner to introduce evidence that he had passed a polygraph test. In other words, the Commonwealth was amenable to a change of venue for the sole purpose of eliminating the trial court's rationale for allowing Riner to introduce evidence about the polygraph test. Riner initially objected to the basis of the Commonwealth's motion but eventually decided to join it. During the discussion on the Commonwealth's motion, Riner did not present any other reasons for joining in the motion nor did he reiterate his prior argument concerning pre-trial publicity. Thus, we consider only whether the trial court abused its discretion in refusing the Commonwealth's specific motion.

Contrary to Riner's argument, the trial court's statement that at least some of the jurors probably knew about Riner's trip to Panama cannot be understood as a question in the court's mind about the jurors'

impartiality.  Instead, the trial court merely indicated that, when deciding whether Riner could introduce evidence that he had passed the polygraph test, it could not ignore the fact that some jurors probably knew about the Panama trip.  The trial court's statement was not a finding that the jurors in fact had this knowledge and could not ignore it, or that the jury was not impartial.

"[T]here is a presumption that a defendant can receive a fair trial from the citizens of the jurisdiction in which the offense occurred."  Mueller v. Commonwealth, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992).  Only when that presumption is overcome by evidence "demonstrating that the feeling of prejudice on the part of the citizenry is widespread and is such that would 'be reasonably certain to prevent a fair trial' " is a change of venue warranted. Id. (quoting Stockton v. Commonwealth, 227 Va. 124, 137, 314 S.E.2d 371, 380 (1984)).  The Commonwealth's reason for requesting a change of venue was to avoid an anticipated evidentiary ruling it did not like.  That reason was not sufficient to overcome the presumption that Riner could receive a fair trial from the citizens of Wise County. Thus, we hold that the trial court did not abuse its discretion in denying the Commonwealth's motion for a

17

change of venue, that motion having been joined in by
Riner. See id.

### B. JUROR MISCONDUCT

On the 16th day of trial, the trial court dismissed
juror Gibson from jury service because of his failure to
abide by the court's instructions concerning discussion of
the case among jurors while the trial was ongoing. Riner
made several motions for a mistrial based on this juror's
misconduct, all of which the trial court denied. The Court
of Appeals concluded that the trial court did not abuse its
discretion in denying Riner's motions for a mistrial. See
Riner, 40 Va. App. at 465-70, 579 S.E.2d at 684-86. We
agree.

The problems with juror Gibson began on day eight of
the trial. That morning, before trial commenced, juror
Gibson went to the office of the Commonwealth's Attorney to
ask a question about one of the Commonwealth's exhibits,
the medical examiner's report. The juror spoke with the
secretary of the Commonwealth's Attorney and stated that
the exhibit indicated that Riner found his wife's body but
that other evidence showed that Riner was at the hospital
when Denise's body was found at the fire scene.[7] The

---

[7] The parties stipulated that the information in the
exhibit was incorrect because Riner was in fact at the

18

Commonwealth's Attorney did not talk to juror Gibson and immediately reported the incident to the trial court. Riner moved for a mistrial on the grounds that juror Gibson had ignored the court's instructions and had conducted, or attempted to conduct, an independent investigation. The trial court denied the motion, finding no prejudice to Riner.

On the 11th day of trial, the bailiff delivered a note from a juror to the trial court. The note was directed to the Commonwealth's Attorney and asked, "It has been established that the floor under the body was unburnt; what type of clothing, if any, was under the body." Although Riner now asserts that juror Gibson was the author of this note, he presented no evidence to establish that fact. Nor did he move for a mistrial when the note was brought to the trial court's attention.

During Riner's testimony on day 16 of the trial, his counsel moved for a mistrial because of juror Gibson's "distractions, inattentiveness, and . . . misconduct." Counsel noted that this juror had been talking to two fellow jurors during the presentation of evidence. Riner's counsel stated to the trial court, "I don't know what's

---

hospital when his wife's body was found in the burned house, and the trial court so instructed the jury.

going on in the jury room, but if he's . . . doing that publicly in the courtroom, my common sense tells me that he's engaging in similar conduct . . . in other places." The trial court and the Commonwealth's Attorney acknowledged that they had also noticed some of the behavior pointed out by Riner's counsel.

The trial court decided to question under oath juror Gibson as well as the two jurors to whom he had been speaking in the jury box. During the questioning of juror Gibson, he admitted commenting to two jurors about exhibits while witnesses were testifying. One of those exhibits was a picture showing Denise's pearl ring. Juror Gibson had pointed out to another juror that "it looks like that pearl ring that [Denise] got and [Riner] said he didn't recognize any of the rings." Juror Gibson also admitted that he had sometimes watched for audience or lawyer reaction to certain evidence rather than looking at the witnesses who were testifying. The two jurors who were questioned confirmed that juror Gibson had made comments to them about certain exhibits. However, they both stated that they had not been influenced by juror Gibson's comments and still had an open mind about the case.

Riner then moved for a mistrial, not because of any concern about the two jurors to whom juror Gibson had made

comments in the jury box, but because of "the kind of unknown comments he's made in the jury room." In the alternative, Riner asked the trial court to excuse juror Gibson. The trial court denied the mistrial motion but did dismiss juror Gibson from jury service.

The trial court subsequently advised the remaining 14 jurors that it had released juror Gibson and asked en masse whether juror Gibson had commented to any of them about the facts, exhibits, or evidence in the case. Eight jurors answered affirmatively by raising their hands. The trial court then questioned those eight jurors individually under oath.

That questioning revealed that juror Gibson had indeed made comments about the evidence. For example, he had speculated that, if Denise was not clothed, she might have been raped, and he had discussed a witness's testimony about the terms "flammable" and "combustible." Juror Gibson also had made inappropriate sexual comments to a juror. All the jurors who were questioned expressed their annoyance with juror Gibson and his behavior. They told the trial court that they had repeatedly asked him to refrain from discussing the evidence, and some admitted that they had attempted to avoid him. They were also adamant that they had not been influenced by juror Gibson's

21

behavior and comments, still had open minds about the case, and could be fair to both sides.  In one juror's words, "[Y]ou could tell he was kind of a blow bag."

Several jurors also reported that juror Gibson had frequently contacted his wife during the lunch break in order to learn what the newspaper headlines said about the trial.  He had then attempted to share that information with the jury.  However, only one juror remembered anything specific that he had said about the newspaper reports.  That juror recalled that juror Gibson had mentioned that a newspaper article reported that the defense had moved for a mistrial because jurors were taking notes.

After the juror questioning was completed, Riner renewed his motion for a mistrial on three specific grounds:  (1) the comment to a juror in the jury box about the exhibit showing the pearl ring; (2) the speculation that Denise might have been raped if she was not clothed; and (3) the newspaper report about the defense mistrial motion.  The trial court overruled Riner's motion.[8]  The trial court did, however, give the jury a cautionary instruction with regard to juror Gibson's behavior and comments:

22

The Court instructs you jurors that Mr. . . . Gibson, one of your jurors yesterday, throughout the trial until yesterday, made certain assertions and the Court admonishes you and warns you that you cannot believe and you should not and you shall not believe any assertions that he, Mr. . . . Gibson, made while in the courtroom, in the jury box or in the jury room, when we took breaks. Some of his assertions were not correct and you are to ignore and disregard what Mr. . . . Gibson has said. I want you to rely upon your independent recollection of the facts, as they, facts, exhibits and law as it will come out and has come out already in this trial, in this courtroom. You should not consider and again, I advise you and order you to disregard anything, any assertions that Mr. . . . Gibson has said in your presence.

On appeal, Riner separates juror Gibson's activities and comments into two categories, "Third Party Contact" and "Other Misconduct." He argues that he was prejudiced by juror Gibson's third-party contact and/or other misconduct and, therefore, did not receive a fair trial. We do not agree and will address these categories in that order.

### 1. THIRD PARTY CONTACT

Riner asserts that juror Gibson's contact with his wife regarding the newspaper headlines about the case was unauthorized third party contact. Citing Remmer v. United States, 347 U.S. 227, 229 (1954), Riner argues that such contact was presumptively prejudicial, thereby shifting the burden to the Commonwealth to establish that it was

---

[8] Riner also filed a post-trial motion to set aside the verdict in which he challenged the trial court's denial of this mistrial motion based on juror misconduct.

23

harmless to the defendant.  We agree that the legal standard for evaluating a claim of extraneous jury contact requires that " 'any private communication, contact or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury . . . [be] deemed presumptively prejudicial' " unless the contact was pursuant to the directions and instructions of the trial court with complete knowledge by both parties.  Lenz v. Warden, 267 Va. 318, 328, 593 S.E.2d 292, 298 (2004) (quoting Remmer, 347 U.S. at 229).

This presumption, however, is not conclusive.  Id. The prosecution has the burden "to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."  Id.  We explained in Lenz that "[t]he Remmer presumption of prejudice arises upon a showing of two elements: that an extraneous contact with or by a member of the jury took place and that such contact was 'about the matter pending before the jury.' " 267 Va. at 329, 593 S.E.2d at 298 (quoting Remmer, 347 U.S. at 229).

Clearly, juror Gibson's communication with his wife about the headlines in the newspaper was an improper contact with a third party about the matter pending before the jury.  However, it is debatable whether his

24

communication, or attempted communication, of the content of the newspaper headlines to the other jurors constituted extraneous jury contact.  Instead, it is analogous to jurors' reading or hearing news media reports about the criminal trial in which they are sitting.

In Thompson v. Commonwealth, 219 Va. 498, 502-03, 247 S.E.2d 707, 709 (1978), we addressed an incident in which two jurors in a criminal trial admitted that they had read a newspaper article concerning the evidence and the defendant.  We enumerated the following principles for resolving whether that kind of jury conduct denied a defendant of a fair trial:

> First, the influence of newspaper articles or other publicity during a criminal trial may be of such a nature as to deprive a defendant of a fair trial. Second, jurors serving in a criminal case may not, during the trial, properly read newspaper stories or listen to media reports discussing the proceedings. The basis for this elementary proposition is that a juror's information about the case should come only from the evidence presented at trial and not from any extraneous source.  Third, upon a showing that such jurors have read or heard news accounts of the proceedings, the test to be used by the trial court in determining if a mistrial or a new trial should be ordered is whether under the circumstances there has been interference with a fair trial.  Fourth, mere reading or hearing news accounts of the trial while it is in progress does not in every case amount to prejudicial misconduct by the jury as a matter of law. Some publicity to which jurors have been exposed may be inherently prejudicial while in other cases inquiry will be necessary to ascertain whether the information "may have effectively prejudiced the jury in its deliberation."  Fifth, the decision whether such media

25

information brought to the jury's attention results in prejudice to the defendant rests in the sound discretion of the trial court. And, sixth, because there can be no fixed rule which defines what constitutes prejudicial interference with a fair trial, each case must be decided on its special facts.

Id. at 500, 247 S.E.2d at 708 (internal citations omitted).

Our holding in Thompson requires a trial court to determine whether a juror's exposure to media coverage of the proceedings interfered with a fair trial. Unlike extraneous juror contact, a juror's reading or hearing news accounts about a criminal trial is not presumptively prejudicial. For purposes of this case, we will, however, apply the test set out in Remmer and Lenz and assume, as did the Court of Appeals, that juror Gibson's contact with his wife about the newspaper article reporting that the defense had moved for a mistrial because the jurors were taking notes, as well as his communication, or attempted communication, of that information to other jurors, was "sufficient to shift the burden to the Commonwealth" to prove the contact was harmless to Riner. Riner, 40 Va. App. at 468, 579 S.E.2d at 685.

We conclude that the Commonwealth carried its burden. First, juror Gibson was discharged from jury service; so he did not participate in the deliberations that resulted in the guilty verdict. See Gray v. Commonwealth, 233 Va. 313,

26

339, 356 S.E.2d 157, 171 (1987) (finding no prejudice where an alternate juror who failed to respond to voir dire question about family members employed in law enforcement was released from the panel before the case was submitted to the jury and did not participate in the jury's deliberations).  That is a significant fact distinguishing the present case from many other cases involving juror misconduct.  See, e.g., Jackson v. Commonwealth, 267 Va. 178, 197, 590 S.E.2d 520, 531 (2004) (after conclusion of trial, alternate juror stated that she had heard jurors discussing the case before the close of the evidence); Jenkins v. Commonwealth, 244 Va. 445, 460, 423 S.E.2d 360, 370 (1992) (post-trial interview of jury foreman revealed that jurors had discussed defendant's parole eligibility if he received a life sentence); Haddad v. Commonwealth, 229 Va. 325, 327, 329 S.E.2d 17, 18 (1985) (misconduct during lunch break by juror who later became foreman of the jury).

Second, only one juror heard or remembered juror Gibson's comment about the specific newspaper article discussing a defense motion for a mistrial.  Next, the questioning of the jurors revealed that they were not influenced by juror Gibson, actually attempted to avoid him so they would not hear his comments, and still had open minds about the case.  Finally, after releasing juror

27

Gibson, the trial court not only instructed the jurors to disregard anything that juror Gibson had said but also told them that some of his comments were not correct. Unless the record shows otherwise, and it does not in this case, we presume that a jury follows an explicit cautionary instruction given by the trial court. See LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983). In summary, the extraneous juror contact was harmless to Riner. Thus the trial court did not err in denying Riner's motion for a mistrial based on "unauthorized third party contact."

## 2. OTHER MISCONDUCT

Before determining whether juror Gibson's "other misconduct" warranted a mistrial, we reiterate several applicable principles. "[T]he mere fact of juror misconduct does not automatically entitle either litigant to a mistrial." Robertson v. Metropolitan Washington Airport Auth., 249 Va. 72, 76, 452 S.E.2d 845, 847 (1995) (citing Haddad, 229 Va. at 330, 329 S.E.2d at 20); see also Jackson, 267 Va. at 199, 590 S.E.2d at 532. As the party moving for a mistrial, Riner had the burden to establish that juror misconduct "probably resulted in prejudice." Robertson, 249 Va. at 76, 452 S.E.2d at 847. The trial court, in the exercise of its discretion, makes that

28

determination.  Id.  Here, the trial court properly investigated the misconduct when it was brought to its attention.  See id. (trial court abuses its discretion by ruling on motion for mistrial without investigating the alleged misconduct when it is discovered after the jury is discharged).  Finally, we have generally limited findings of prejudicial juror misconduct to events that occurred outside the jury room and that interjected information about the case that was not admitted into evidence. Caterpillar Tractor Co. v. Hulvey, 233 Va. 77, 83, 353 S.E.2d 747, 751 (1987).

Applying these principles, we conclude that the trial court did not abuse its discretion in denying Riner's motions for a mistrial based on the "other misconduct" by juror Gibson.  First, as the Court of Appeals noted, there is no evidence that any juror was aware of juror Gibson's brief contact with the office of the Commonwealth's Attorney or his efforts to resolve an apparent conflict in the evidence.  Riner, 40 Va. App. at 465, 579 S.E.2d at 684.  Thus, Riner has not shown how he was prejudiced by that incident since juror Gibson did not participate in the jury deliberations.

Next, after learning about the anonymous note directed to the Commonwealth's Attorney, Riner did not move for a

29

mistrial.  Thus, he cannot now be heard to complain about that incident.  Rule 5:25.

Continuing, when Riner moved for a mistrial after juror Gibson was released from jury service, Riner was not concerned about the two jurors to whom juror Gibson had been making comments while in the jury box.  Instead, Riner based his motion on unknown comments that juror Gibson might have been making in the jury room.  At that point, the nature of those comments was not known and the trial court had discharged juror Gibson.  Thus, Riner failed to demonstrate how he was prejudiced.

Finally, when Riner renewed his motion for a mistrial after the eight additional jurors had been questioned, he offered only three reasons in support of the motion: (1) juror Gibson's comment about the exhibit showing the pearl ring; (2) juror Gibson's speculation that Denise might have been raped; and (3) the newspaper article about the defense mistrial motion.[9]  We have already dealt with the third reason.  As to the first reason, Riner voiced no concern about the juror who heard the comment about the pearl ring when he moved for a mistrial after juror Gibson had been questioned.  Nevertheless, upon considering the nature of

---

[9] We do not consider grounds for a mistrial that were not raised before the trial court.  See Rule 5:25.

30

that comment as well as juror Gibson's speculation that Denise might have been raped, we conclude that Riner did not establish that juror Gibson's misconduct probably resulted in prejudice to Riner.  See Haddad, 229 Va. at 330, 329 S.E.2d at 20.  As we previously explained, the trial court discharged juror Gibson before the jurors began their deliberations; the jurors were not influenced by juror Gibson but found him annoying; they remained able to listen to the evidence with open minds; and the trial court carefully instructed the jurors to disregard anything juror Gibson had said to them about the case.

## C. PRIVATE PROSECUTOR

Prior to trial, the Commonwealth moved the trial court to allow a private attorney, hired by Denise's family, to assist in the prosecution of the charges against Riner. Over Riner's objection, the trial court granted the motion. Riner renewed his objection prior to trial and again in a post-trial motion to set aside the verdict.  He now assigns error to the trial court's permitting a private attorney to participate and assist in the prosecution of the case. Riner asserts that the attorney should have been barred from serving as a private prosecutor because of an alleged conflict of interest and because the attorney improperly became "de facto lead counsel" for the Commonwealth.  He

31

also urges this Court to abolish the use of private prosecutors.

The private prosecutor had a conflict of interest, according to Riner, because the law firm in which he was a partner represented the parent company of the life insurance company issuing the policy on Denise's life. Riner based that assertion on information contained in the 2000 edition of a publication listing law firms and their representative clients. The private prosecutor, however, avowed to the trial court that he had performed a conflict-of-interest check and that neither he nor his firm currently represented either the parent company or its subsidiary, despite the listing in the publication. The company issuing the life insurance policy had initiated an interpleader action in federal court regarding the life insurance proceeds, but the private prosecutor's law firm did not represent the parent company or any other party in that proceeding. The private prosecutor acknowledged that his firm may represent insureds of the parent company but argued the client, in that situation, is the insured, not the insurance company. He also admitted that his firm had represented the parent company about 10 years prior to the present trial.

In <u>Cantrell v. Commonwealth</u>, 229 Va. 387, 392, 329

S.E.2d 22, 26 (1985), we stated that "[t]he common-law right of a crime victim, or of [the victim's] family, to assist the prosecution with privately employed counsel is not absolute, but lies within the discretion and continuing control of the trial court."  However, a private prosecutor who has "a civil interest in the case so infects the prosecution with the possibility that private vengeance has been substituted for impartial application of the criminal law, that prejudice to the defendant need not be shown." Id. at 394, 329 S.E.2d at 26.  In that situation, a defendant's due process rights under Article I, § 11 of the Constitution of Virginia are violated.  Id. at 394, 329 S.E.2d at 26-27.

The trial court, in the exercise of its discretion, must determine whether the private prosecutor had a conflict of interest.  That determination in this case was factual and depended on whether the private prosecutor and/or his law firm represented either the parent company of the insurance company issuing the life insurance policy on Denise's life or the insuring company itself.  The trial court accepted the representations of the private prosecutor that he had checked for any conflict of interest and found none.  We agree with the Court of Appeals that the trial court "was entitled to credit [the private

prosecutor's] representations" over the information contained in a publication entry listing the parent company as a representative client of the firm. Riner, 40 Va. App. at 473, 579 S.E.2d at 687. We reach this conclusion even though, as Riner demonstrated at a post-trial hearing, the 2001 version of the publication contained the same information. The trial court's factual findings on this issue were not plainly wrong or without evidence to support them. Thus, they are binding on appeal. Mercer v. Commonwealth, 259 Va. 235, 243, 523 S.E.2d 213, 217 (2000).

Riner further argues that the private prosecutor became the "de facto lead counsel" by delivering the opening statement; actively participating in objections, motions, and bench conferences; conducting the direct examination or cross-examination of expert witnesses; and presenting argument on jury instructions. He claims that the private prosecutor controlled the presentation of the Commonwealth's evidence of arson, which was the means by which it proved the murder charge. In other words, Riner contends that the public prosecutor did not remain in control of the case.

In Cantrell, we explained the role of a private prosecutor:

34

His role is more limited than that of the public prosecutor. By the weight of authority, he may not initiate a prosecution or appear before the grand jury; he may appear only by leave of the trial court; he may participate only with the express consent of the public prosecutor; he may make a closing jury argument only in the court's discretion; and he may take no part in a decision to engage in plea bargaining, deciding the terms of a plea bargain, or a decision to accept a plea of guilty to a lesser crime or to enter a <u>nolle prosequi</u>. Although there is no arbitrary limitation as to the proportion of work which may be done by a private prosecutor, the public prosecutor must remain in continuous control of the case.

229 Va. at 393, 329 S.E.2d at 26 (internal citations omitted).

Riner does not suggest that the private prosecutor engaged in any prohibited activities but only that he dominated the case. However, upon reviewing the record, we cannot say that the trial court abused its discretion with regard to the level of participation by the private prosecutor. It is true that his efforts focused on proving the arson charge; indeed arson was one of the areas in which he had considerable experience in the practice of law. However, we agree with the Court of Appeals, "[p]ermitting private prosecutors to handle only innocuous witnesses and evidentiary matters would effectively abrogate the common-law principle that still permits their appointment." <u>Riner</u>, 40 Va. App. at 474, 579 S.E.2d at 688. We conclude that the public prosecutor, not the

35

private prosecutor, "remain[ed] in continuous control of the case." Cantrell, 229 Va. at 393, 329 S.E.2d at 26.

Finally, we reiterate that "[t]he policy arguments advanced by [Riner] for a total prohibition of privately employed prosecutors may have a sound basis in considerations of public policy, but we think it advisable to leave to the General Assembly such a basic change in the long-established common law of Virginia." Id. at 392, 329 S.E.2d at 25. Nor do we believe that the General Assembly's amendment of Code § 19.2-155 in 1996 reflects any preference on the part of the General Assembly to restrict the private bar from appearing as prosecutors. Contrary to Riner's assertion, the statute cannot be viewed as a change in the common law allowing the use of private prosecutors. Accordingly, we decline Riner's suggestion that we should overrule Cantrell and abolish the right of a crime victim, or the victim's family, to employ private prosecutors to assist the Commonwealth. Such a change in our common law is for the General Assembly to make, rather than the courts.

For all these reasons, we conclude that the trial court did not err in permitting the private attorney to assist in the preparation and prosecution of the charges against Riner nor in the level of his participation allowed

36

by the court.  Both matters were within the discretion and continuous control of the trial court.  See Cantrell, 229 Va. at 393, 329 S.E.2d at 26.

### D.  HEARSAY EVIDENCE

Two of Riner's assignments of error concern the trial court's admitting hearsay statements into evidence.  The trial court allowed the admission of double hearsay by permitting a witness to testify about a threat made by Riner to Denise, as related by Denise to the witness.  The other hearsay evidence about which Riner complains concerned an entry in a pawn shop journal that the trial court admitted without any testimony from the employee who made the entry.

Before addressing the hearsay issues before us, we note that, subsequent to oral argument before this Court, the Supreme Court of the United States decided Crawford v. Washington, ___ U.S. ___, 124 S.Ct. 1354 (2004).  In that case, the prosecution had played for the jury the tape-recorded statement made to the police by defendant's wife, who was at the scene of the crime, but the defendant had not had an opportunity for cross-examination because the defendant's wife was unavailable as a trial witness due to the invocation of marital privilege.  Id. at ___, 124 S.Ct. at 1357.  For purposes of determining when a prior

statement by an unavailable declarant may be admitted into evidence without violating the Confrontation Clause, the Supreme Court drew a distinction between hearsay statements that are "testimonial" and those that are "non-testimonial."  Id. at ___, 124 S.Ct. at 1374.  The Court held that, "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability [of the declarant] and a prior opportunity for cross-examination [by the defendant]."  Id.  The Court declined to provide a comprehensive definition of "testimonial" hearsay but offered some examples of the "core class of 'testimonial' statements": ex parte testimony at a preliminary hearing, statements obtained during custodial police interrogations, affidavits, and " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "  Id. at ___, 124 S.Ct. at 1364.

In light of the decision in Crawford and its potential impact on the hearsay issues in this appeal, we requested letter briefs from the parties addressing whether the decision applied to or affected the hearsay issues.  In response, both Riner and the Commonwealth agreed that Crawford has no bearing on whether the trial court properly

38

admitted the pawn shop journal because, as a business record, it was not "testimonial" hearsay.  Indeed, the Court in Crawford indicated that business records are a type of hearsay "that by their nature [are] not testimonial."  Id. at ___, 124 S. Ct. at 1367.  With regard to the double hearsay concerning the threat, Riner stated that, "[a]t the time [the witness] testified, there was no reason to probe whether, in the context of Denise's statement to [the witness], Denise (the declarant) would reasonably have expected her statement to be used prosecutorially."  In the absence of such evidence, Riner admitted that he cannot assert that Denise's statement to the witness was "testimonial" hearsay within the rule announced in Crawford.  Thus, in light of the parties' admissions, we conclude that the decision in Crawford is not relevant to the hearsay issues before us.  We turn now to those specific issues.

### 1. DOUBLE HEARSAY

The Commonwealth called several witnesses to testify about the relationship between Riner and Denise and to show that Riner had threatened to take the children and never let Denise see them if Denise separated from him.  When the Commonwealth called Donna Brickey to provide such testimony, Riner objected and asked for a bench conference.

39

Based on information obtained from an insurance investigator's notes, Riner believed Brickey would testify that Denise had told her about an incident in the early 1990s when Riner told Denise he would kill her if she ever attempted to take the children away from him.

Riner first objected on the basis that the incident was too remote in time, but the Commonwealth proffered that Riner had made the threat within the year before the fire. Riner then stated, "It's double hearsay; . . . [i]t doesn't show [Denise's] state of mind." The Commonwealth responded, "[A]ny threats made by the defendant that [were] communicated to the decedent [are] admissible to show the relationship of the parties, show his motive and his intent." After hearing further argument on the issue, the trial court admitted the testimony, ruling that "[i]t certainly shows threats of violence in the relationship between the parties; state of mind of the accused."

Brickey then testified, and the Commonwealth asked whether Denise ever expressed any concerns about separating from Riner. Brickey responded, "Well, [Denise] did say that [Riner] had told her that if she tried to leave him that he would take the kids away and she would never see them again." The Commonwealth then asked Brickey whether Denise had told her about any threats by Riner. Brickey

answered, "[Denise] said that [Riner] told her that if she tried to leave him and take the kids that he would kill her."

On appeal, Riner asserts that the trial court erred in admitting Brickey's testimony about his threat to kill Denise. He argues that the testimony contained double hearsay and that, to be admissible, "both the primary hearsay declaration and each hearsay declaration included within it must conform to a recognized exception to the hearsay rule." West v. Commonwealth, 12 Va. App. 906, 910, 407 S.E.2d 22, 24 (1991). We agree that the testimony contained double hearsay and with the principle stated in West. However, we find that Riner waived this claim.

During argument on his objection to Brickey's double hearsay testimony, Riner asserted that the statement at issue was inadmissible because Denise's telling Brickey about the threat did not show Denise's state of mind. That objection obviously addressed the second level of hearsay, i.e., when Denise repeated the threat to Brickey. The trial court admitted the testimony, ruling that "[i]t certainly shows threats of violence in the relationship between the parties; state of mind of the accused."[10] At

_____

[10] To the extent that the Court of Appeals found that the trial court had ruled that Brickey's statement was

that point, Riner asked the trial court, "What about the second part, Judge, the stuff from the early 90's?" Riner was referring to portions of Brickey's anticipated testimony that pertained to threats allegedly made by Riner to Denise many years ago. The trial court concluded that those statements were not admissible because of their remoteness.

Significant to this appeal is the fact that Riner did not at that juncture in the trial remind the court that it had not ruled on the admissibility of <u>both</u> levels of the double hearsay contained in Brickey's testimony. Specifically, the trial court never decided whether the second level of hearsay fell within a recognized exception to the hearsay rule. The trial court dealt with only the first level of hearsay and concluded that Riner's threat to Denise was admissible because it demonstrated his state of mind.

Riner's failure to renew his objection or bring to the trial court's attention the fact that it had not ruled on his objection challenging the second level of hearsay is analogous to the situation addressed by this Court in <u>Green</u>, 266 Va. 81, 580 S.E.2d 834. As already explained,

admissible to show Denise's state of mind, that finding was in error. The trial court did not make such a ruling.

42

the defendant there did not renew his change of venue motion, previously taken under advisement by the trial court, before the jury was empanelled and sworn, nor did he remind the court that it had not ruled on the motion.  Id. at 94, 580 S.E.2d at 842.  We refused to address the defendant's assignment of error that the trial court had erred in refusing to grant a change of venue because the defendant had waived the issue.  Id. at 95, 580 S.E.2d at 842.

We reach the same result here.  Riner's objection to Brickey's testimony focused on the second level of the hearsay.  He claimed that Denise's repeating the threat to Brickey did not fall within an exception to the hearsay rule, thus making the entire statement inadmissible.  See West, 12 Va. App. at 910, 407 S.E.2d at 24.  Riner did not challenge both levels of the hearsay nor did he need to do so.  However, by failing to bring to the trial court's attention the fact that it had ruled only on the admissibility of the primary hearsay in the statement, Riner did not afford the trial court the opportunity to rule intelligently on the issue now before us.  See Johnson v. Raviotta, 264 Va. 27, 33, 563 S.E.2d 727, 731 (2002) (trial court must have "an opportunity to rule intelligently on a party's objections," thereby "avoid[ing]

unnecessary mistrials or reversals"). In that circumstance, the issue is waived on appeal.[11] See Rule 5:25; Lenz, 261 Va. at 463, 544 S.E.2d at 306 (failure to request ruling on pretrial motion waived issue on appeal); Hoke v. Commonwealth, 237 Va. 303, 306, 377 S.E.2d 595, 597 (1989) (failure to renew change of venue motion waived the issue under Rule 5:25); cf. Horner v. Dep't of Mental Health, 268 Va. 187, 194, 597 S.E.2d 202, 206 (2004) (failure to assign cross-error on an issue the Court of Appeals did not address waives further appellate review of the issue).

## 2. PAWN SHOP JOURNAL

As already stated, Riner sold jewelry belonging to Denise after the fire. The Commonwealth called Cheryl A. Brown, manager of the pawn shop where Riner sold the items,

_____

[11] In the letter brief, Riner also argues that Brickey's hearsay testimony violated his rights under the Confrontation Clause because the hearsay neither fell within a "firmly rooted hearsay exception" nor bore "particularized guarantees of trustworthiness" as required by Ohio v. Roberts, 448 U.S. 56, 66 (1980). We conclude that Riner waived the constitutional argument he now makes. When he objected to Brickey's testimony at trial, he relied only on state law hearsay grounds in support of his objection. Riner did not mention the Sixth Amendment or the Confrontation Clause. Under this Court's contemporaneous objection rule, see Rule 5:25, we do not consider a constitutional argument raised for the first time on appeal. See Johnson v. Commonwealth, 267 Va. 53, 71, 591 S.E.2d 47, 57 (2004); Cherrix v. Commonwealth, 257 Va. 292, 308 n.3, 513 S.E.2d 642, 652 n.3 (1999).

to testify about the transaction.  Brown remembered an occasion when an investigator from the Wise County Sheriff's Department came to the shop in search of some jewelry.  The investigator was accompanied by some individuals that Brown later learned were Denise's sisters.  According to Brown, Denise's sisters "immediately" identified three of Denise's rings in a glass case containing "maybe a thousand" rings.

Brown explained the legal requirements in Tennessee for pawn shop transactions.  The seller or pawnor must present valid photographic identification, and the pawn shop must record the name, address, and other information about the pawnor as well as information about the items pawned or sold.  Continuing, Brown testified that an entry in a journal kept in the regular course of the pawn shop's business showed that, on March 11, 1999, an individual by the name of Charles Douglas Riner, with a Tennessee driver's license bearing an address of 159 Bear Drive, Bluff City, Tennessee, sold three rings, four pocket watches, and other assorted merchandise for the sum of $230.  The number assigned to that transaction corresponded to the number on the rings identified by Denise's sisters.

Upon learning during Brown's testimony that she had not personally handled the transaction at issue, Riner

45

moved to strike her testimony and objected to the introduction of the journal into evidence. With regard to the hearsay issue before us, Riner stated that the journal was not admissible because Brown only approved the amount to pay Riner for the jewelry and did not make the entry into the journal, and because the Commonwealth had not established that the actual entrant was unavailable to testify. After hearing Riner's objection, the trial court allowed Brown to testify in more detail about the entrant. Brown stated that the employee who made the relevant entry in the pawn shop journal was 79 years of age and was "off on sick leave" because she had "suffered a back injury" and was "unable to get up right now." After hearing this additional evidence, Riner renewed his hearsay objection.[12] Although the trial court stated, "I don't know whether she's in the hospital or is available or not," it ultimately allowed the introduction of the pawn shop journal. The Court gave the following explanation for its ruling:

> I think it's relevant, I'm going to allow it and overrule your motion and find it to be an exception to the hearsay rule under the Shopbook Rule, the business records kept. I think the fact that this is even

---

[12] Riner also objected to the admission of the journal on grounds of relevancy, but that issue in not before us on appeal.

overwhelmingly better because of the fact that this woman . . . Apparently, they, in Tennessee they put a lot of requirements and restrictions and legal requirements on them in order to keep their records correct and I think the records show total trustworthiness and total . . . Tennessee is looking over their shoulder very carefully at these pawn shops and loan shops.

Later, during Riner's testimony, he admitted that he had sold a bag of what he described as "scrap jewelry" to the pawn shop in Bristol, Tennessee and used his driver's license as identification during the transaction. According to Riner, he found the jewelry, after moving to Bluff City, Tennessee, in a zippered bag that he had salvaged out of a safe kept in the basement of the burned house in Coeburn. Riner denied having ever seen the three rings that Denise's sisters identified. He did not, however, deny that the three rings were part of the items he had sold to the pawn shop; instead, he stated, "I can't say they were or weren't." He also admitted that an employee at the pawn shop "went through each individual item separately."

On appeal, Riner argues that the trial court erred in admitting the pawn shop journal because the Commonwealth failed to prove that the individual who entered the relevant information in the journal was unavailable to

47

testify at trial.[13]  The Court of Appeals rejected this argument, finding that the "evidence in the record supports a finding that the employee who made the entry in the pawn shop's records was unavailable because she was out of work with a back injury that left her 'unable to get up' at the time of trial."  Riner, 40 Va. App. at 478, 579 S.E.2d at 690.  We agree with that conclusion.  Because the trial court's factual finding that the entrant was not available to testify is supported by the evidence, we conclude that the court did not err in admitting the pawn shop journal.[14]

### E. SUFFICIENCY OF THE EVIDENCE

To prove arson, as with any criminal charge, the Commonwealth must establish beyond a reasonable doubt both the corpus delicti and criminal agency.  Cook v. Commonwealth, 226 Va. 427, 431, 309 S.E.2d 325, 328 (1983)

---

[13] Riner also asserts on brief that he was denied the right to cross-examine the entrant.  However, he did not make a constitutional objection at trial with regard to the admission of the pawn shop journal.  We will not consider a constitutional argument raised for the first time on appeal.  See Johnson, 267 Va. at 71, 591 S.E.2d at 57; Cherrix, 257 Va. at 308 n.3, 513 S.E.2d at 652 n.3.

[14] The parties, the trial court, and the Court of Appeals viewed the unavailability of the entrant as a requirement for admission of the pawn shop journal under the business records exception to the hearsay rule.  For that reason, we treat the unavailability requirement as the "law of the case."  However, we intimate no view in today's decision whether unavailability of the entrant is indeed a requirement under the business records exception.

(citing <u>Jones v. Commonwealth</u>, 103 Va. 1012, 1021, 49 S.E. 663, 666 (1905)). The <u>corpus delicti</u> of arson "must consist of proof that the fire was of incendiary, rather than of accidental origin." <u>Id.</u> Here, Riner challenges the sufficiency of the evidence only with regard to the <u>corpus delicti</u>, i.e., whether the fire was of incendiary origin. Notably, Riner does not challenge on appeal the sufficiency of the evidence to support the jury's determination that he was the criminal agent. In other words, Riner implicitly agrees that the Commonwealth presented sufficient evidence to establish beyond a reasonable doubt that, if the fire was of incendiary origin, he was the criminal agent who started the fire.

With regard to the <u>corpus delicti</u>, a defendant has the benefit of a presumption that the fire was caused by accident. <u>Id.</u> (citing <u>Simmons v. Commonwealth</u>, 208 Va. 778, 782, 160 S.E.2d 569, 572-73 (1968)). That presumption is, however, rebuttable. <u>Knight v. Commonwealth</u>, 225 Va. 85, 89, 300 S.E.2d 600, 602 (1983). "Whether the origin of a fire was accidental or incendiary is a question of fact, and resolution of that question may, and often must, turn upon the weight of circumstantial evidence." <u>Id.</u> Such is the present case.

The Commonwealth's evidence regarding the incendiary origin of the fire came primarily from two individuals, Clark D. Davenport and John D. Walker, both of whom testified as experts in the field of investigating the origin and cause of fires. Davenport and Walker each inspected the Riner home after the fire and concluded that the fire was of incendiary origin.

Specifically, Walker opined that the "fire started at the south end of the home" where the living room and master bedroom were located, and that it "was caused by an intentional human act meaning it was an incendiary or an arson fire." In his opinion, the fact that the floor of the front porch and the "uprights" in the porch were completely consumed by the fire was unusual and indicated "a tremendous amount of fire at the whole front end of that home." Because of the extent of burning on the floor of the Riner house and the burn patterns there, Walker further opined that "liquid accelerant" had been poured on the fire and that the liquid "ignited and burned the floor first before everything else fell down on top of the floor." Walker testified that he eliminated any potential accidental cause of the fire and found no indication that the fire started in the electrical panel box because there was no evidence of arcing there. Even though an analysis

50

of debris samples that Walker had collected from the fire scene contained no evidence of liquid accelerant residue, Walker did not alter his conclusions.

Similarly, Davenport opined that "deep seated charring of burn patterns in areas on the floor of the master bedroom" were caused by "burning of an ignitable liquid that had been poured on the floor." During his investigation of the fire, Davenport found evidence of newspaper strips in several areas of the house, including the floor in the master bedroom where Denise's body was found. Davenport opined that the newspapers were "used as an accelerant to spread the fire." He stated that "the newspapers in conjunction with an ignitable liquid were spread throughout the first floor of the dwelling in the areas where [he] determined that a flammable liquid or ignitable liquid patterns were discovered."

Davenport further testified that he found no evidence that would cause him to conclude that the origin of the fire could not be determined or was accidental. He also discounted a theory advanced by one of the defense's expert witnesses that the fire had been caused by a short circuit in a baseboard heater. In Davenport's opinion, the evidence of short-circuiting that he found in the wiring that remained in the house was the result of the fire and

51

not the cause of it. When asked what kind of analysis he performed to eliminate other possible sources of ignition, Davenport responded, "In conjunction with Mr. Riner's statements to me, as far as the condition of the house, smoking habits, electrical problems, coupled with what I observed at the scene, I was able to eliminate the natural or accidental fire causes verses [sic] what I saw; glaring evidence of an ignitable liquid poured and burned."

It is true, as Riner argues, that other expert witnesses who investigated the fire, some of whom testified on behalf of the Commonwealth, opined that the origin of the fire could not be determined. It is also true that Riner introduced evidence showing that the fire had been caused by a short circuit in a baseboard heater. But, as Riner conceded during oral argument, the conflicting evidence created a "credibility battle" among the experts. " 'Conflicting expert opinions constitute a question of fact . . . .' " Mercer, 259 Va. at 242, 523 S.E.2d at 217 (quoting McCaskey v. Patrick Henry Hospital, 225 Va. 413, 415, 304 S.E.2d 1, 2 (1983)). In that situation, it is within the province of the finder of fact, in this case the jury, " 'to assess the credibility of the witnesses and the probative value to be given their testimony.' " Id.

(quoting Richardson v. Richardson, 242 Va. 242, 246, 409 S.E.2d 148, 151 (1991)).

Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court, see Higginbotham, 216 Va. at 352, 218 S.E.2d at 537, we conclude that there was sufficient evidence from which the jury reasonably could have inferred that the fire was incendiary in origin. "When a fact-finder has accepted the testimony of a qualified expert witness, which negates every reasonable possibility that a fire was of accidental origin, we cannot hold the evidence insufficient, as a matter of law, to support a finding that the fire was of incendiary origin." Cook, 226 Va. at 432, 309 S.E.2d at 328. Accordingly, we hold that the trial court did not err in finding the evidence of arson sufficient to support the jury verdict.

### III. CONCLUSION

For the reasons stated with regard to each of Riner's assignments of error, we find no error in the judgment of the Court of Appeals. Thus, we will affirm that judgment and Riner's convictions.[15]

Affirmed.

---

[15] In light of our decision, it is not necessary to address the Commonwealth's assignments of cross-error.

JUSTICE KOONTZ, with whom CHIEF JUSTICE HASSELL and JUSTICE KEENAN join, dissenting.

I respectfully dissent.  In my view, the record in this case does not support the majority's conclusion that Charles Douglas Riner waived his objection to the admission of the double hearsay testimony of Donna Brickey at issue in this appeal.  In the absence of such waiver, the record clearly establishes that the erroneous admission of this evidence was not harmless error.  It is axiomatic that under such circumstances Riner was denied a fair trial and his convictions for the first degree murder of his wife, Karen Denise Riner, and for arson must be reversed.

The majority correctly relates the context in which the hearsay issue arose at Riner's trial and the substance of the testimony of Brickey, who was called as a witness by the Commonwealth to relate the purported statements made to her by Denise, prior to Denise's death in the fire that destroyed the Riners' home.  The Commonwealth sought to establish the tempestuous relationship between Riner and his wife in support of its theory of the case that the fire was not accidental.  Over Riner's objection, Brickey was permitted to testify that Denise had told her that Riner had said that "if [Denise] tried to leave him and take the kids that he would kill her."  Beyond question, Brickey's

54

testimony was "double hearsay and thus doubly suspect" because her testimony concerned a statement made by Denise, one level of hearsay, recounting a statement made by Riner, another level of hearsay.  Service Steel Erectors Co. v. International Union of Operating Engineers, 219 Va. 227, 236, 247 S.E.2d 370, 376 (1978).  To be admissible, both levels of hearsay must fall within a recognized exception to the hearsay rule.  West v. Commonwealth, 12 Va. App. 906, 909-10, 407 S.E.2d 22, 24 (1991).  The majority agrees that Brickey's testimony constituted double hearsay and that the principle established in West restricts the admissibility of such testimony.

Riner objected to the admission of Brickey's testimony on the ground that "[i]t's double hearsay; . . . [i]t doesn't show [Denise's] state of mind."  Rule 5:25 requires that an objection be made "with reasonable certainty" in order to enable the trial judge to rule on the objection intelligently and, thus, to avoid unnecessary reversal on appeal.  While admittedly Riner's objection could have been stated more precisely to assert that both levels of the hearsay did not fall within a recognized exception to the hearsay rule as required by West, the objection as stated substantially complied with the requirements of Rule 5:25.  Overton v. Slaughter, 190 Va. 172, 179, 56 S.E.2d 358, 362

(1949) ("substantial compliance" with contemporaneous objection rule found where objection was "sufficiently broad to have given the trial court notice of the substance of the objection"); Levine v. Levine, 144 Va. 330, 336-37, 132 S.E. 320, 322 (1926) (explaining that "it was not intended that a strict compliance with the letter of the [contemporaneous objection] rule should be necessary to enable a litigant to ask [for] the consideration . . . of an objection or exception which was plainly and manifestly made in the trial court, and the grounds of which appear from the ruling thereon by the trial court"). See also Conquest v. Mitchell, 618 F.2d 1053, 1056 (4th Cir. 1980) (finding that, under Virginia law, "if an objection is raised in such a manner so as to give the trial court notice of its substance, the rule will be deemed complied with even though the objection could have been more definitively given").

In this case, the trial judge was not called upon to rule upon the objection in a vacuum or without the opportunity to rule intelligently. Riner's objection clearly called to the trial judge's attention that Brickey's testimony contained "double hearsay" and that at least one level, concerning Denise's state of mind, was inadmissible because it did not fall within a recognized

exception to the hearsay rule. While the trial judge did not expressly rule on the admissibility of both levels of hearsay contained in Brickey's testimony, the judge admitted Brickey's entire testimony on the ground that her testimony "shows threats of violence in the relationship between the parties, state of mind of [Riner]."

The majority acknowledges that Riner did not need to challenge both levels of hearsay contained in Brickey's testimony in order to invoke the principle stated in West regarding the admission of double hearsay. And, indeed, but for the double hearsay context in which it was presented by Brickey's testimony, Riner does not dispute that one level of hearsay, the statement that he had threatened to kill Denise if she left him and took the couple's children, would have been admissible as relevant to show his state of mind and potential motive. Nevertheless, the majority concludes that Riner waived his objection to Brickey's testimony because he failed to renew his objection or "bring to the trial court's attention" the fact that it had not ruled on his objection challenging Denise's statement to Brickey. In effect, the majority treats Brickey's testimony as if it were divisible or consisted of discrete parts, apparently because it contained "double hearsay." Brickey's testimony that was

the subject of Riner's objection, however, was not susceptible to division.  Brickey's knowledge of Riner's purported threats of violence against Denise came to her solely from Denise's purported statement to her.  Thus, it was necessary that Brickey's testimony include both levels of hearsay in order for her testimony to convey anything intelligible and relevant to the jury.  The trial judge's ruling then necessarily resolved the issue of both levels of hearsay contained in Brickey's testimony by ruling that her entire testimony was admissible.

The majority expressly and principally relies upon an analogy it draws from the situation we addressed in Green v. Commonwealth, 266 Va. 81, 93-95, 580 S.E.2d 834, 841-42 (2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1448 (2004), to support its conclusion that Riner has waived his objection to Brickey's testimony.  I respectfully disagree with that analogy.  In Green, the defendant's change of venue motion was taken under advisement.  The defendant subsequently did not renew his motion before the jury was empanelled and sworn or remind the trial court that the motion was still pending and that he wanted the court to rule on it.  Id. at 93-94, 580 S.E.2d at 841-42.  We concluded that the defendant had waived the issue regarding the change of venue.  Id. at 95, 580 S.E.2d at 842.

In the present case, however, the question whether to admit Brickey's double hearsay testimony was not the subject of a pre-trial motion that Riner failed to renew at the time Brickey testified. Rather, the objection was made at the point at which the evidence was to be admitted at Riner's trial. There can be no doubt that Riner objected to the admission of Brickey's testimony on the ground that Denise's out-of-court statement to Brickey did not fall within a recognized exception to the hearsay rule. When the trial court ruled that Brickey's entire testimony was admissible, there was no need or occasion for Riner to "renew" the objection just made. Indeed, Code § 8.01-384, and cases construing it, not only expressly make such objection "unnecessary," but also indicate that the objection was sufficient to preserve Riner's right to contest the trial court's admission of the "double hearsay" testimony on appeal.

In relevant part, subsection (A) of Code § 8.01-384 provides that:

> Formal exceptions to rulings or orders of the [trial] court shall be unnecessary . . . [and] it shall be sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefore; and, if a party has no opportunity to object to a ruling or order at the time it is

59

made, the absence of an objection shall not thereafter prejudice him on motion for a new trial or on appeal.

Code § 8.01-384(A). Significantly, the statute also expressly states that:

No party, after having made an objection or motion known to the court, shall be required to make such objection or motion again in order to preserve his right to appeal, challenge, or move for reconsideration of, a ruling, order, or action of the court.

Id.

Cases applying this language clearly indicate that once a party makes the trial court aware of its objection to a particular ruling, there is no need for that party, as a means of preserving its appeal rights, to subsequently repeat the substance of its objections by noting a formal exception. See, e.g., Ward v. Insurance Co. of North America, 253 Va. 232, 233 n.1, 482 S.E.2d 795, 795 n.1 (1997) (citing Code § 8.01-384); Richmond Dept. of Soc. Servs. v. Carter, 28 Va. App. 494, 497, 507 S.E.2d 87, 88 (1998) (plaintiff's claim that defendant failed to preserve standard of proof issue for appeal held "meritless" because "[o]nce the objection was made at trial, the [defendant] was not required to make it again to preserve the issue" under Code § 8.01-384(A)); Brown v. Commonwealth, 23 Va. App. 225, 229-30, 475 S.E.2d 836, 838-39 (1996) (where

60

arguments of defense counsel concerning admissibility of hearsay evidence alerted the trial court to the possibility of error and gave it the opportunity to take corrective actions, arguments held sufficient as an objection to preserve admissibility issue for appeal under Code § 8.01-384).

In addition, the majority's approach ignores the burden of proof on a hearsay objection. When an objector draws the trial court's attention to the fact that the form of proposed proof is hearsay, "the party attempting to introduce a hearsay statement has the burden of showing the statement falls within one of the exceptions." Robinson v. Commonwealth, 258 Va. 3, 6, 516 S.E.2d 475, 476 (1999); Doe v. Thomas, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984) (" 'One seeking to have hearsay declarations of a witness admitted as an exception to the general rule must clearly show that they are within the exception.' "), quoting Skillen and Son, Inc. v. Rosen, 359 S.W.2d 298, 301 (Tex. 1962). Thus, once Riner made the hearsay objection it was the Commonwealth's burden to demonstrate the admissibility of each "level" of hearsay involved.

In general it has been this Court's practice to recognize that a hearsay objection that is not fully argued below before a ruling admitting proof is made will be

sufficient to bring the merits of the hearsay issue before us.  Thus, in Frank Shop, Inc. v. Crown Cent. Petroleum Corp., 261 Va. 169, 174, 540 S.E.2d 897, 900 (2001), the opponent raised a hearsay objection, the proponent suggested that there were four theories involved, and the trial court ruled to allow the putative hearsay into evidence before the admission theories were even argued by counsel.  This Court proceeded to assess the evidence and hold it inadmissible under the hearsay rule.  Id. at 176, 540 S.E.2d at 901.  See also Code § 8.01-384(A); Ward, 253 Va. at 233 n.1, 482 S.E.2d at 795 n.1; Carter, 28 Va. App. at 497, 507 S.E.2d at 88; Brown, 23 Va. App. at 229-30, 475 S.E. 2d at 838-39.

While the trial court's ruling expressly addressed only the hearsay statement made by Riner to Denise, I am unwilling to conclude that the trial court was unaware that the effect of the ruling was to admit the hearsay statement made by Denise to Brickey.  The trial court surely understood the significance of Riner's "double hearsay" objection.  To require Riner to reiterate the argument already made on the admissibility of the hearsay as between Denise and Brickey and demand an express ruling from the trial court on that issue was just as surely unnecessary.  Additionally, the view taken by the majority would place

every criminal defendant in the position of having to request full and express rulings from the trial court on every objection in order to avoid the waiver applied in this case, a practice that is wholly impractical.

Though differing from the reasoning applied by the majority, the Commonwealth contends that Riner has waived his objection to the double hearsay evidence at issue on two grounds. First, the Commonwealth asserts a waiver because Riner did not object to the testimony of two witnesses showing the discord in the Riners' marital relationship, and he had cross-examined one of those witnesses regarding whether Denise had ever complained of being physically abused by Riner. Second, the Commonwealth asserts that Riner has not challenged the actual ruling of the trial court, which was that the hearsay evidence was admissible under an exception to show the state of mind of Riner rather than Denise. Both assertions of waiver are without merit.

With regard to the first, none of the other evidence elicited by the Commonwealth or by Riner upon cross-examination included the direct assertion that Riner had ever threatened to kill Denise. There was no evidence of physical abuse suffered by her. A death threat manifestly

is not the same character as a threat to withhold the couple's children in the event of a divorce.

With regard to the Commonwealth's second assertion of waiver, failure to challenge one level of hearsay within a double hearsay statement would not constitute a waiver because when a party objects that a proffered statement is hearsay it is the burden of the proponent of the statement to show that it is admissible. Where the notion that the statement has two levels of hearsay has been presented to the trial judge, it is the burden of the proponent of the evidence to demonstrate to the judge that there is an exception warranting receipt of both levels of the hearsay. In this case, it is clear that at trial, in the Court of Appeals, and presently in this appeal, Riner has not focused on the fact that Brickey's statement quotes Riner (theoretically admissible as party admission or a statement of Riner's state of mind) but has pursued the objection to the fact that Brickey's testimony recounts an out-of-court statement by Denise that does not fit a hearsay exception (not an "excited utterance," not within the admissible state of mind doctrine in Virginia).

For these reasons, I am of opinion that a finding of waiver of the issue regarding whether the trial court erred in admitting the double hearsay testimony of Brickey is not

64

warranted and that the issue is properly before this Court in this appeal.  Accordingly, I will address the merits of Riner's assertion that Brickey's testimony was erroneously admitted against him at his trial.

In general terms, "hearsay is an out-of-court statement offered to prove the truth of the matter asserted and . . . hearsay includes testimony by a witness who relates not what he knows personally but what others have told him or what he has read." Robinson v. Commonwealth, 258 Va. 3, 6, 516 S.E.2d 475, 476 (1999).  "[H]earsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule, and . . . the party attempting to introduce a hearsay statement has the burden of showing the statement falls within one of the exceptions." Id., 516 S.E.2d at 476-77 (internal citation omitted).  Pertinent to the present case, we have stated that "[g]enerally, [hearsay] statements made by a crime victim that show the victim's state of mind are admissible as an exception to the hearsay rule, provided the statements are relevant and probative of some material issue in the case." Clay v. Commonwealth, 262 Va. 253, 257, 546 S.E.2d 728, 730 (2001).  "Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue." Id.  In the specific circumstance of a hearsay

65

statement purporting to show the state of mind regarding the fear of a victim with respect to a death threat or threat of violence made to the victim by the accused, the hearsay statement of the victim is admissible to rebut claims by the defense that the victim's death was the result of suicide, or where the defense admits some role in the events causing the victim's death, but contends that the death was the result of an accident or an act of self-defense.  Id.; United States v. Brown, 490 F.2d 758, 770-71 (D.C. Cir. 1973).  "When those defenses are not in issue . . . the statement would become relevant only through 'a circuitous series of inferences.' "  Hanson v. Commonwealth, 14 Va. App. 173, 188, 416 S.E.2d 14, 23 (1992) (quoting Brown, 490 F.2d at 771).

Riner's asserted theory of the case was that the fire was accidental and that Denise's death in that fire was also accidental.  This defense excludes an admission that he accidentally caused the fire and obviously does not involve a claim of suicide or self-defense.  As previously noted herein, but for the double hearsay context in which it was presented by Brickey's testimony, Riner does not dispute that one level of the hearsay, the purported statement that he had threatened to kill Denise if she left him and took the children, was relevant to show his state

of mind and potential motive to commit the crimes for which he was on trial.  Rather, the thrust of Riner's contention is that the second level of hearsay, Denise's statement to Brickey, could only show that Denise's state of mind was fear and that state of mind was not relevant to any issue in the case.  Riner contends that Denise's state of mind was not probative of Riner's state of mind because had Riner possessed the motive and intent to kill her, "either would have existed independent of [Denise's] fear of him or any other state of mind."  West, 12 Va. App. at 910, 407 S.E.2d at 24.  Riner also finds support for his contentions in Evans-Smith v. Commonwealth, 5 Va. App. 188, 211, 361 S.E.2d 436, 449 (1987).  Noting that West and Evans-Smith are factually similar to the present case, Riner asserts that Denise's statement did not comply with the requirements of the state of mind exception to the hearsay rule and was inadmissible.

In response, the Commonwealth contends that the trial court properly admitted the statement to show Denise's state of mind under the state of mind exception to the hearsay rule as enunciated in Clay.  The Commonwealth asserts that Brickey's testimony showed a motive for Riner to kill his wife once she declared her intent to divorce him and to use his abuse of his step-son to prevent him

from obtaining custody of the couple's children. The Commonwealth further contends that the statement "showed that Riner viewed the loss of his children on an equal footing with the need to rectify his financial problems." The Commonwealth interprets Clay broadly and argues that our holding there was not limited to cases in which there is an asserted defense of self-defense, suicide, or accidental death in which the accused admittedly played some role. The Commonwealth's position would essentially permit the state of mind exception to consume the hearsay rule. Denise's fear of Riner, if such were the case, was not relevant because Riner would have had the motives suggested by the Commonwealth in this case regardless of that state of mind on her part. Moreover, under Clay, Denise's statement recounting Riner's threat was not admissible under the state of mind exception to the hearsay rule to rebut Riner's assertion of accidental death because Riner was not contending that the fire was the result of his actions. Accordingly, the trial court erred in admitting Brickey's testimony.

Where, as here, the erroneous admission of evidence is not of constitutional dimension, the standard for reviewing the harm to the defendant, if any, is to consider whether

68

"when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Clay, 262 Va. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946). See Code § 8.01-678 (providing the statutory standard for harmless error involving nonconstitutional error).

The record does not support the Commonwealth's assertion that Brickey's testimony "was only a fraction of the motive evidence against Riner" and, thus, any error in admitting this testimony was harmless. To the contrary, despite other evidence that the Riner's marriage was discordant, no other witness testified that Riner had ever been physically abusive to Denise or had threatened her with physical violence. Nor was the evidence of Riner's financial difficulties in itself indicative that he would seek to profit from her death. Thus, the evidence that Riner had once threatened to kill Denise if, as actually transpired, she sought to end their marriage and separate

him from their children, was not merely cumulative of other motive evidence.

It is a regrettable but well acknowledged fact that numerous marriages in this Commonwealth terminate in divorce. The suggested reasons for that fact are also numerous. In such cases it is also regrettable but not uncommon that the actual separation and divorce of a couple is preceded by arguments and even threats of violence. In this context, prior threats of violence or death become especially significant where a spouse anticipating a divorce is the alleged victim of a homicide. Indeed, where, as here, such a spouse has related to another a death threat made by her husband, and the specifics of that threat comport with the subsequent events leading up to the alleged victim's death, the death threat essentially becomes a lens through which the jury will focus on the evidence and assess the rest of the prosecution's case against the accused. Under such circumstances, far from having slight or no effect on the verdict, it " 'cannot [be said], with fair assurance . . . that the judgment was not substantially swayed by the error.' " Clay, 262 Va. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos, 328 U.S. at 765). At the very least, in this case the error creates a

"grave doubt" and, accordingly, "the conviction cannot stand."  Id.

For these reasons, I would hold that the trial court's erroneous admission of Brickey's double hearsay testimony concerning the death threat Riner allegedly made to Denise was not harmless.  Accordingly, I would reverse Riner's convictions for first degree murder and arson on this ground and remand the case for a new trial if the Commonwealth be so advised.