COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Humphreys, O'Brien and Malveaux
Argued at Richmond, Virginia

JESSE GREGORY EDMOND

OPINION BY
v.        Record No. 0557-15-2        JUDGE MARY BENNETT MALVEAUX
AUGUST 2, 2016

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Beverly W. Snukals, Judge

Jennifer M. Newman (Jennifer M. Newman, P.C., on brief), for
appellant.

Benjamin H. Katz, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

Jesse Gregory Edmond (appellant) appeals his conviction for murder, in violation of Code

§ 18.2-32, robbery, in violation of Code § 18.2-58, conspiracy to commit robbery, in violation of

Code §§ 18.2-58, -22, use of a firearm in the commission of a felony, in violation of Code

§ 18.2-53.1, and use of a firearm in commission of a felony, subsequent offense, in violation of

Code § 18.2-53.1. He argues that the trial court erred when it denied his motion to suppress and

subsequent motion to reconsider because the officer stopping the vehicle did not have reasonable

suspicion for the stop. We disagree, and, for the following reasons, affirm the convictions.

I. BACKGROUND

On May 5, 2014, at 3:58 p.m., the City of Richmond Police Department received

information that a crime was committed at Victoria Jewelers, located at 309 East Broad Street.

Responding officers found the victim, Muhammad Haroon Baig, deceased with a gunshot wound

to his head. Detective Michael Gouldman arrived to assist in the investigation. He noted that

roughly half of the merchandise was missing from the display cases, the office in the back of the store had been "ransacked," and the DVR recording system had been pulled out and smashed. The store's owner confirmed that much of his merchandise was missing, as well as some cash that had been located below the register. The owner told police that he last spoke with Baig by phone at 2:44 p.m. that afternoon.

Earlier that day, at approximately 12:30 p.m., Detective Christopher Henry of the Henrico Police Department received a report of a suspicious situation at a Citizen and Farmers Bank located in Henrico County. Once Henry arrived at the bank, a teller told him that she had observed a suspicious situation with a man and woman. The couple entered the bank together. The woman initially went to a teller's station near the witness while the man stayed at a table in the center of the bank lobby. This station was experiencing computer issues. The woman was redirected to the witness' teller station, and the man joined her there. The two spoke quietly with each other while at the teller station. The woman appeared to be wearing a wig and was holding a piece of paper that the teller believed was "some sort of a note." When the bank teller asked the two individuals how she could help them, the man asked for change for a dollar. The teller told him that if he needed change, he could go to the convenience store across the street. The man and woman then left the bank. Surveillance footage from the bank captured the incident and the individuals involved.

When the individuals left the bank, another teller went outside and saw them enter a blue Dodge Durango SUV with the Virginia license plate "VAR-5735." The Durango's hazard lights were on, and it was parked on the grass shoulder of the street where the bank was located.

Detective Henry learned that the Durango was registered to Auto Plus Used Car Sales. After speaking with an Auto Plus manager, he learned that the Durango had been leased on May 1, 2014. The manager told Henry that the vehicle was equipped with a GPS tracking device, and

he obtained the Durango's GPS location for the detective. At approximately 2:30 p.m. on May 5, the Durango was on North Third Street, just north of Broad Street, in the City of Richmond.

Later that day, Henry saw a news story about the incident at Victoria Jewelers. Due to the proximity of the Durango to the jewelry store shortly before the robbery occurred, he contacted Detective Gouldman and gave him the information he had about the incident at the Citizen and Farmers Bank.

The next day, May 6, 2014, Henry contacted the manager of Auto Plus and received an updated GPS location for the Durango, which placed it in Roanoke Rapids, North Carolina. Henry provided this information to Gouldman. He also provided Gouldman with surveillance footage of the man and woman from the bank incident. Gouldman noted the distinctive appearance of the individuals in the video: the woman was wearing a sweater that had "bold up-and-down" stripes, boots, and a wig, while the man was wearing a green and white striped shirt. He also noticed that the woman appeared to be wearing glasses when she entered the bank, but that at some point she took them off and the man put them on.

That same day, May 6, the Richmond Police Department contacted the U.S. Marshal's fugitive unit for assistance in locating the Durango. Deputy Marshal Bryan Konig, supervisor of the U.S. Marshal's Violent Fugitive Task Force in North Carolina, was contacted just prior to lunchtime and asked to locate a 2002 blue Dodge Durango "that was involved in a series of criminal activities that occurred on May the 5th in various areas of Eastern Virginia." While on the way to Roanoke Rapids, he spoke with an officer from that jurisdiction who told him that he had successfully located the vehicle in response to a request by the Henrico County Police Department.[1] Detective Gouldman personally contacted Konig during this period. In their initial

---

[1] Detective Henry had also contacted the U.S. Marshal Service on May 6 and requested assistance in locating the vehicle. He relayed the information regarding the Citizen and Farmers

- 3 -

conversation, Gouldman told Konig that he did not have anything to directly connect the vehicle to the jewelry store incident. Gouldman did tell Konig that the criminal activity in Virginia involved an attempted bank robbery, a convenience store robbery,[2] and a robbery and homicide at a jewelry store.

Shortly after arriving in Roanoke Rapids, Konig located the vehicle and began surveillance. The Durango made several stops at local restaurants and stores. Throughout these stops, Konig frequently updated Detective Gouldman on the movements of the vehicle and its occupants.

Later on May 6, Gouldman obtained surveillance footage from the Richmond Times-Dispatch building from May 5, the date of the robbery/homicide. The building had a movable security camera on the corner of Grace Street, which had a view of Broad Street and North Third Street, and also showed the entrance to an alleyway located between Grace Street and Broad Street. The back door of Victoria Jewelers opened into this alley. The only way to exit the alley was through North Third Street. The surveillance video, which had a time stamp of 2:52 p.m., showed four individuals, three men and one woman, coming out of the alley carrying several large items, bags, and boxes. The individuals then loaded the items into a dark-colored Dodge Durango and proceeded south on Third Street towards Franklin Street. Of the four individuals, Gouldman could describe two men only as "wearing dark clothing." However, the woman and other man "match[ed] the clothing descriptions to a tee exactly as the two individuals that were seen in the . . . [b]ank video." He noted that the man was wearing "the

_____

Bank and Victoria Jewelers incidents and asked them to visually verify that the vehicle was in Roanoke Rapids. He requested the same verification from the Roanoke Rapids Police Department. Detective Henry did not have any direct contact with Deputy Marshal Konig during these communications.

[2] The convenience store robbery occurred in Chesterfield County. Detective Gouldman was later unable to connect it to the other incidents that occurred on May 5, 2014.

- 4 -

green-and-white plaid shirt" and that the woman was wearing the "boldly striped sweater and boots."

After reviewing this video, Gouldman called Deputy Marshal Konig at around 5:00 p.m. and told him about the additional surveillance footage. He told Konig that he wanted to have the vehicle stopped in order to identify the occupants, but he did not want anyone arrested at that time. Konig told Gouldman that one of the vehicle's tail lights was out.[3] Gouldman decided to ask local law enforcement to stop the vehicle. Gouldman directed Konig to have the local agency conduct the stop so as not to alert the occupants that the U.S. Marshal Service was involved. At the time, Konig believed that a broken tail light was a traffic infraction under North Carolina law. Konig asked Officer Kristopher Jordan of the Roanoke Rapids Police Department to stop the vehicle without alerting the occupants of the Marshal Service's involvement. Konig advised Jordan that two brake lights were not functioning and that the vehicle was "involved in criminal activity in Eastern Virginia." At the time of the stop, Officer Jordan knew that a broken tail light was not an infraction under North Carolina law, and made the stop solely to identify the occupants for Konig.[4]

Once the Durango was stopped, Officer Jordan relayed the occupants' information to Konig, who then provided the same information to Detective Gouldman. From Konig, Gouldman learned the identities of the occupants of the Durango: appellant, Anthony Lenard, Jermeaka Gorham, and Tiandra Gregory.

---

[3] In Gouldman's report of the incident, he wrote that the vehicle was stopped because it had "a tail light out for defective equipment." The report also stated that "Gouldman advised Konig there was no probable cause to arrest at that time" for the Virginia crimes.

[4] At the suppression hearing, the prosecution conceded that at the time of the traffic stop, there was no broken tail light infraction under North Carolina law.

After obtaining DMV photos of all four individuals, Gouldman identified Lenard and Gorham as the two persons involved in the Henrico County bank incident. Gouldman obtained warrants to arrest Lenard and Gorham for conspiracy to commit murder. Lenard was already under arrest from the traffic stop for an outstanding grand larceny warrant. Once Gorham was arrested, she made a statement to a Roanoke Rapids officer: "Why are you only arresting me? You just looked the killer in the eyes and let him walk away." Based on that statement, Gouldman obtained a warrant for appellant for conspiracy to commit murder.

On October 31, 2014, appellant filed a motion to suppress the evidence, alleging it was obtained during the course of an illegal seizure under the Fourth Amendment. At the hearing on the motion to suppress, held December 2, 2014, the Commonwealth argued that the seizure was valid, relying on the collective knowledge doctrine. The trial court found that the collective knowledge doctrine applied and denied the motion to suppress.

On February 4, 2015, appellant was found guilty by a jury of murder, robbery, conspiracy to commit robbery, use of a firearm in the commission of a felony, and use of a firearm in the commission of a felony, subsequent offense. On March 17, 2015, appellant filed a motion to reconsider denial of the motion to suppress. The trial court denied appellant's motion to reconsider.

## II. STANDARD OF REVIEW

When challenging the denial of a motion to suppress evidence on appeal, the defendant bears the burden of establishing that reversible error occurred. Glenn v. Commonwealth, 275 Va. 123, 130, 654 S.E.2d 910, 913 (2008). The determination of whether reasonable suspicion exists "involve[s] questions of both law and fact" and consequently is reviewed *de novo* on appeal. McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*). In conducting this review, the Court is "bound by the trial court's findings of historical fact

unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Id. at 198, 487 S.E.2d at 261.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures[] shall not be violated." U.S. Const. amend. IV. "[W]hen the police stop a motor vehicle and detain an occupant, this constitutes a seizure of the person for Fourth Amendment purposes." Logan v. Commonwealth, 19 Va. App. 437, 441, 452 S.E.2d 364, 367 (1994) (*en banc*) (quoting Zimmerman v. Commonwealth, 234 Va. 609, 611, 363 S.E.2d 708, 709 (1988)). "In order to justify an investigatory stop of a vehicle, the officer must have some reasonable, articulable suspicion that the vehicle or its occupants are involved in, or have recently been involved in, some form of criminal activity." Id. "A reasonable suspicion is more than an 'unparticularized suspicion or "hunch."'" Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 923 (2000) (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). "However, it is something less than probable cause." Jackson v. Commonwealth, 267 Va. 666, 673, 594 S.E.2d 595, 598 (2004). We "must consider the totality of the circumstances in determining whether a police officer had a particularized and objective basis for suspecting that a person stopped may be involved in criminal activity." Bass, 259 Va. at 475, 525 S.E.2d at 924.

III. ANALYSIS

On appeal, appellant claims Deputy Marshal Konig did not have a reasonable, articulable suspicion that criminal activity was afoot inside the Durango at the time of the stop. He further asserts that any knowledge Konig possessed of any criminal activity was speculative and not communicated to Officer Jordan, who stopped the Durango. Further, appellant argues that law enforcement only learned the identity of the occupants as a result of the illegal stop, and

- 7 -

therefore, under Zimmerman, 234 Va. 609, 363 S.E.2d 708, appellant's identity should be suppressed. Contrary to appellant's assertions, we find that Officer Jordan, under the collective knowledge doctrine, lawfully stopped the vehicle in which appellant was riding.

A. Collective Knowledge Doctrine: Origins and Adoption

The collective knowledge doctrine was discussed in *dicta* in the United States Supreme Court's decision in Whiteley v. Warden, 401 U.S. 560, 568 (1971). In Whiteley, a county sheriff, acting on an informer's tip, issued an arrest warrant for two suspects based on "nothing more than the [sheriff's] conclusion that the individuals named therein perpetrated the offense described in the complaint." Id. at 565. A radio bulletin was issued on a state-wide police network with a description of the suspects and the crime allegedly committed. The bulletin further indicated that arrest warrants for both individuals had been issued. An officer in another county, relying on this bulletin, arrested the two men.

The Court first reviewed the warrant for probable cause and found it lacking. However, in support of upholding the arrests, the state argued that the police relied on the radio bulletin for the arrest, not the issuing officer's unnamed informant, and thus the arrest was proper. While the Court did not find this argument persuasive, it did note that,

> [w]e do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

Id. at 568. Thus, the court indicated that an officer could stop an individual based upon probable cause determinations made by other law enforcement agencies.

- 8 -

The Supreme Court further developed this principle in the context of reasonable suspicion in United States v. Hensley, 469 U.S. 221 (1985). In Hensley, the police interviewed an informant who told them that the defendant had driven the getaway car during an armed robbery. A "wanted flyer" was then issued, and an officer from another jurisdiction stopped the defendant based upon this flyer. The Supreme Court first determined that the officer who issued the "wanted flyer" possessed a reasonable suspicion that defendant was involved in an armed robbery. It then upheld the evidence seized during the Terry stop[5] even though the arresting officer relying on the flyer did not know the factual basis of suspicion, because the "police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop." Id. at 233. The Court in Hensley reasoned that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop." Id. at 232.

The Court further noted that

> Whiteley supports the proposition that, when evidence is
> uncovered during a search incident to an arrest in reliance merely
> on a flyer or bulletin, its admissibility turns on whether the officers
> who *issued* the flyer possessed probable cause to make the arrest.
> It does not turn on whether those relying on the flyer were
> themselves aware of the specific facts which led their colleagues to
> seek their assistance.

Id. at 231. The Court acknowledged that in the modern era, with increased mobility of criminal suspects and their ability to flee across jurisdictional boarders, law enforcement's reliance on these bulletins allows them to act promptly. Id. For these reasons, the Court found that the "rule is a matter of common sense." Id. Thus, the Whiteley and Hensley decisions support the premise that where an officer's action is directed by another officer, that action is proper as long

---

[5] See Terry v. Ohio, 392 U.S. 1 (1968).

- 9 -

as the directing officer has the requisite knowledge to justify the action under the appropriate legal standard.

Many federal circuit courts have addressed the collective knowledge doctrine and its rationale, including the United States Court of Appeals for the Fourth Circuit in United States v. Massenburg, 654 F.3d 480 (4th Cir. 2011).[6] In Massenburg, two officers responded to an anonymous tip about shots having been fired in a high crime area. They encountered four men, including the defendant. The officers asked the individuals if they would consent to be searched. Two of the men complied voluntarily, but Massenburg did not. Instead of agreeing to be searched, he stated that he did not need to be searched, then "air-patted himself down . . . trying to show he didn't have anything." Id. at 483. One officer nevertheless frisked him involuntarily, and recovered a gun and a small amount of marijuana. The second officer testified that prior to the frisk he observed what he believed to be a small bulge in Massenburg's jacket, but he did not communicate this to the officer who conducted the frisk.

In Massenburg, the government argued that, under the collective knowledge doctrine, the non-frisking officer's uncommunicated observation of a bulge in defendant's jacket could be imputed to the frisking officer and thus serve as a basis for reasonable suspicion to conduct the pat down. The Fourth Circuit rejected this expansive interpretation of the doctrine. It explained the doctrine, "as enunciated by the Supreme Court, holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." Id. at 492. The court in Massenburg rejected the government's argument that the uncommunicated knowledge of the two officers

---

[6] See also United States v. Patiutka, 804 F.3d 684 (4th Cir. 2015). We recognize that cases decided by the Fourth Circuit are persuasive and not binding upon this Court.

could be aggregated, stating that, "the collective-knowledge doctrine simply directs us to substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*; it does not permit us to aggregate bits and pieces of information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions." Id. at 493.

Although this Court has not previously adopted the collective knowledge doctrine,[7] we find that the principle derived from Whiteley, Hensley, and Massenburg—that an officer is justified in acting upon an instruction from another officer if the instructing officer had sufficient information to justify taking such action himself—is applicable in this case.[8] We find that this principle both protects the Fourth Amendment privacy interest and recognizes important modern-day law enforcement realities. "The Fourth Amendment rights of the defendant are adequately protected by the requirement that the officers issuing the order or request have an adequate basis for doing so, such that if they were present at the scene, they could justifiably stop or arrest the suspect." United States v. Nafzger, 974 F.2d 906, 911 (7th Cir. 1992). Thus, "[b]y imputing the investigating officer's suspicions onto the responding officer, without requiring the responding officer to independently weigh the reasonable suspicion analysis, the collective knowledge doctrine 'preserves the propriety of the stop' and avoids crippling restrictions on our law enforcement." United States v. Lyons, 687 F.3d 754, 766 (6th Cir. 2012) (quoting United States v. Ibarra-Sanchez, 199 F.3d 753, 760 (5th Cir. 1999)).

---

[7] This Court first addressed the collective knowledge doctrine in White v. Commonwealth, 24 Va. App. 234, 481 S.E.2d 486, aff'd en banc on other grounds, 25 Va. App. 662, 492 S.E.2d 451 (1997).

[8] Our Supreme Court has recognized the principle from Henlsey and applied it in the context of imputed knowledge in Commonwealth v. Smith, 281 Va. 582, 709 S.E.2d 139 (2011). In Smith, the Court held that Hensley permitted the imputation to frisking officers of the knowledge of officers who entered information into a police database, where the information indicated the suspect was "probably armed and a narcotics seller/user." Id. at 591-92, 709 S.E.2d at 143.

B.  Collective Knowledge Doctrine:  Application

Applying the collective knowledge doctrine to the instant matter, there are two crucial questions we must address.  First, did the officer directing the stop have the requisite legal knowledge to stop the Durango?  And, second, who was the instructing officer?  Here, we find that Detective Gouldman possessed the reasonable articulable suspicion to effect the stop.  Further, contrary to appellant's assertion, we find that Detective Gouldman was the instructing officer.

We first address the facts supporting reasonable suspicion for the stop.  Detective Gouldman, through his investigation, developed information placing the Durango in the area of Victoria Jewelers at the time of the robbery and homicide.  Detective Henry of the Henrico Police Department informed Gouldman that the Durango was in the vicinity of the crime scene at 2:30 p.m.  See Wells v. Commonwealth, 6 Va. App. 541, 552, 371 S.E.2d 19, 25 (1988) ("Proximity to the scene of a recently committed crime is another factor which police may consider in determining whether to engage in a Terry stop.").  From the Richmond Times-Dispatch surveillance video, Detective Gouldman was able to match by their clothing two individuals from both the incident at Citizen and Farmers Bank and the alley between Grace and Broad Streets, behind Victoria Jewelers.  The surveillance footage, with a time stamp of 2:52 p.m., showed these individuals and two men in dark clothing loading large items, bags, and boxes into a Dodge Durango.  The store's owner stated he last spoke with the decedent employee at 2:44 p.m.  It was not until all of these facts were known to Gouldman that he requested the stop of the Dodge Durango.[9]  Here, Gouldman possessed more than an "unparticularized

_____

[9] At trial, Gouldman noted that in a previous conversation with Konig on the day of the stop, he told Konig that he did not have information linking the vehicle to the robbery and homicide.  This conversation occurred before the discovery of the Richmond Times-Dispatch

- 12 -

suspicion or hunch" of possible criminal activity. Based on the totality of the circumstances, we hold that Gouldman possessed a reasonable, articulable suspicion that the vehicle and/or its occupants were involved in, or had recently been involved in, criminal activity.

We now address the second question, the identity of the instructing officer. While appellant does not contest that Gouldman had reasonable suspicion for the stop, he argues that the stop was invalid because Konig was the instructing officer and did not have the information necessary for a finding of reasonable suspicion.[10] However, we find that Konig was little more than a conduit or "go between" transmitting information to the Roanoke Rapids police to effect the stop. Detective Gouldman was the instructing officer in this case. Gouldman requested that Konig ask local law enforcement to stop the Durango and identify the occupants. Like the officer who issued the flyer in Hensley, Gouldman was the officer who initially developed the reasonable suspicion for the stop. Therefore, it is Gouldman's knowledge that the Court must examine to determine whether the requisite knowledge for reasonable suspicion existed at the time of the stop.[11] As discussed above, we find that Gouldman possessed the required knowledge.

_____

surveillance video. Until that time, Konig had been watching the occupants and the SUV, but had not engaged any of them or impeded the travel of the Durango.

[10] On appeal, the Commonwealth argued that all the relevant information regarding reasonable suspicion that Gouldman had was communicated to Konig, who was the instructing officer. Therefore, Konig possessed reasonable articulable suspicion sufficient to stop the vehicle. While the Commonwealth's argument is persuasive, because we find that Gouldman was the instructing officer, we need not address whether Konig had the necessary information to provide him with reasonable suspicion for the stop.

[11] Appellant argues that Officer Jordan's knowledge of some criminal activity alone was insufficient to effect the stop. We agree. However, Officer Jordan only stopped the Durango upon the request of Konig, who was following Gouldman's request. Jordan was nothing more than the officer relying on the instructing officer's request to stop the vehicle.

Appellant also argues that the facts in this case constitute an improper aggregation of knowledge as disavowed by the Fourth Circuit in Massenburg.  This argument is unpersuasive.  Massenburg specifically held that uncommunicated aggregation of knowledge between officers in an effort to create reasonable articulable suspicion violates the Fourth Amendment.  Here, there was simply no aggregation of information at all.  Gouldman possessed all of the information necessary to create reasonable suspicion.  There was no additional information from Konig or Jordan that added more facts to the reasonable suspicion analysis.  As there was no aggregation of information, either communicated or not, the stop of the vehicle clearly did not violate Massenburg.

The facts of this case fall squarely in line with the Supreme Court's collective knowledge reasoning in Whiteley and its progeny.  We hold that the collective knowledge doctrine is applicable in this matter and therefore the stop did not violate the Fourth Amendment.[12]

### III.  CONCLUSION

For the reasons above, we hold that the trial court did not err in denying appellant's motion to suppress.  Accordingly, we affirm the trial court's judgment.

<u>Affirmed.</u>

---

[12] In light of this ruling, we do not address appellant's argument that his identity should have been suppressed due to the illegal stop of the vehicle.