COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present: Judges Beales, Malveaux and Senior Judge Clements
Argued by teleconference


SHAKA MARKEL LONG

OPINION BY
v.      Record No. 1971-19-1                JUDGE RANDOLPH A. BEALES
                                            JANUARY 26, 2021
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF YORK COUNTY
Richard H. Rizk, Judge

Michael A. Hyman (Collins & Hyman, on brief), for appellant.

Victoria Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Appellant Shaka Markel Long was convicted in the Circuit Court of York County of

transporting a Schedule I/II controlled substance into the Commonwealth, possession with intent to

distribute a Schedule I/II controlled substance, possession with intent to distribute marijuana, and

conspiracy to distribute a Schedule I/II controlled substance. Long was convicted upon a

conditional guilty plea that preserved his right to appeal the circuit court's denial of his motion to

suppress. In this appeal, he argues that the circuit court erred in allowing testimony to be admitted

at the suppression hearing regarding information "obtained from informants over the defense's

objection." Furthermore, he argues that the circuit court "erred in overruling and denying

Appellant's Motion to Suppress."

I. BACKGROUND

"In accordance with established principles of appellate review, we view the 'evidence in the

light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial

court.'" Bryant v. Commonwealth, 72 Va. App. 179, 182 (2020) (quoting Riner v. Commonwealth,

268 Va. 296, 330 (2004)). As we must for the same reason, "[w]e also accord the Commonwealth the benefit of all inferences fairly deducible from the evidence." Id. (quoting Riner, 268 Va. at 303).

At the hearing on Long's motion to suppress, Investigator Josh Drury of the James City County Police Department testified that he worked on a regional drug task force assigned to investigate street-level and high-profile drug cases in the greater Williamsburg area. Investigator Drury said that the task force routinely utilized undercover operations and confidential informants who would provide information helpful to the task force's investigations. He stated that approximately "a month or so" before the events giving rise to this appeal, he began communicating with C.E., a confidential informant who was concerned about her daughter's involvement with drugs and her daughter's dealings with a woman named Lauren Jarrell. Investigator Drury testified that he learned from C.E. that C.E.'s daughter had overdosed in the past and sought treatment, but upon her release from rehabilitation, she came back in contact with Jarrell and began using drugs again. Investigator Drury stated that he was familiar with Jarrell, who had been listed as an "involved other or a witness" in multiple overdose cases around James City County. Investigator Drury testified that he was aware of Jarrell's involvement in these cases and that the overdoses occurred at several different motels around the area. In addition, Investigator Drury said that he had conducted several arrest operations and "post-arrest debriefs" during which numerous targets of the task force's investigations provided information on Jarrell.

C.E. informed Investigator Drury that C.E. and her daughter shared a vehicle, a gray Honda Civic, and that both of their names were on the registration for the Honda Civic. According to C.E., the two specifically discussed that they would not let other people drive the vehicle, and C.E. was concerned that her daughter was allowing Jarrell to use the vehicle for the purpose of conducting drug transactions. Based on her suspicions, C.E. purchased a GPS tracking device and installed it in

the Honda Civic in order to monitor its location. She would regularly text or call Investigator Drury with information about the location of the vehicle, which information Drury corroborated by reviewing highway toll records and toll video footage. In addition, Investigator Drury verified the license plate number of the vehicle through the Virginia Department of Motor Vehicles (DMV).

On February 8, 2018, around 9:30 p.m., Investigator Drury was off duty and at home when he received a call from C.E. She explained that her daughter had been arrested earlier that day and was in jail but that the GPS tracker showed that the Honda Civic was still moving around Williamsburg. C.E. told Investigator Drury that she wanted her vehicle back. She tracked the location of the vehicle using the GPS device that she had installed on it and informed Investigator Drury that the vehicle had stopped moving and was stationary at the Travel Lodge on Bypass Road in York County. Investigator Drury testified that, in his role as a member of the drug task force, he had visited the Travel Lodge roughly "[t]hirty or more times" to conduct "post-arrest debriefs" in cases involving drug transactions that took place at the Travel Lodge. Investigator Drury then drove to the Travel Lodge and arrived there approximately forty-five minutes after he received the call from C.E. Upon entering the parking lot, Drury saw a gray Honda Civic. The license plate of the Honda Civic matched the license plate that Investigator Drury had previously verified through DMV.

As he drove past it in his unmarked car, Investigator Drury said that he noticed that the driver's seat of the Honda Civic was empty, although there was a woman seated in the passenger's seat. Next to the Honda Civic, Investigator Drury observed a black Dodge Durango with North Carolina license plates. There were two people in the Durango – one in the driver's seat and one in the passenger's seat. Investigator Drury testified that Long was seated in the driver's seat, "and then

who I suspected to be Lauren Jarrell[,] based on DMV photos and Lin[x][1] photos[,] seated in the passenger's seat of that Durango."

Investigator Drury said he then proceeded farther into the parking lot and parked his vehicle so that he could continue his surveillance. From his position of surveillance, he observed Long and Jarrell sitting in the vehicle talking to each other, with neither party exiting the vehicle or going inside the Travel Lodge. Because he was off duty, in plain clothes, and in an unmarked vehicle, Investigator Drury did not intend to engage the parties directly. Instead, he testified that he "wanted to just stay off to the side covertly to observe in the event that [he] needed to continue surveillance or tail the vehicles to another location." Consequently, he placed a call to the York County Sheriff's Office dispatch "and asked them to just stop out with the suspicious occupied vehicle in the parking lot."[2] Investigator Drury "didn't really give the dispatcher a whole lot of information as to [the] case" or as to the details of the investigation, but informed the dispatcher that he was off duty, on the scene, and maintaining surveillance.

Deputy Wesley Simms of the York County Sheriff's Office was dispatched to the Travel Lodge in response to the call from Investigator Drury. Deputy Simms testified that, when he arrived at the Travel Lodge, he saw the Honda Civic and Dodge Durango. He stated that he parked approximately two vehicles away from the Durango and activated the emergency lights on his police cruiser. After turning on his emergency lights, Deputy Simms said that he approached the passenger's side of the Durango and made contact with Jarrell, who was still seated in the

---

[1] "LInX" refers to the "Law Enforcement Information Exchange," an "information sharing system and analytical data warehouse containing information from participating state and local law enforcement agencies located within the [] regional LInX system." See https://www.linxnc.us/Linx/WebHelp/Overview.htm (last visited Jan. 22, 2021).

[2] When asked at the suppression hearing what he meant by the phrase "stop out," Investigator Drury testified, "Well, in my mind – I don't know that I rela[ye]d this to dispatch thoroughly, but in my mind, I wanted them to make consensual contact with the suspicious occupied vehicle in the parking lot."

passenger's seat. Ultimately, the stop led Deputy Simms to discover physical evidence that caused Long to be charged with transporting a Schedule I/II controlled substance into the Commonwealth, possession with intent to distribute a Schedule I/II controlled substance, possession with intent to distribute marijuana, and conspiracy to distribute a Schedule I/II controlled substance.

Long moved to suppress the evidence obtained by Deputy Simms, arguing that Deputy Simms's stop of the Durango violated the Fourth Amendment. At the suppression hearing, the Commonwealth elicited testimony from Investigator Drury to explain the basis for his call to the York County Sheriff's Office dispatch asking for someone to "stop out with the suspicious occupied vehicle in the parking lot." When Investigator Drury began explaining the statements C.E. made to Drury prior to and during the phone call on February 8, Long objected "on foundation grounds," arguing that the Commonwealth had not established "where this information is coming from and if it's reliable." The trial judge asked, "So your objection is hearsay for the purposes of reliability and what this officer does next?" Long replied that "[i]t was a foundation objection" because "I don't know where that information is coming from and if it's a reliable source that provided that information or if it's just hearsay here on the streets." The Commonwealth responded that C.E.'s statements were reliable because Investigator Drury corroborated the information that C.E. provided. Furthermore, the Commonwealth maintained that the statements were not offered for their truth, but instead were offered to show the effect the statements had on Investigator Drury and to explain his actions in driving to the motel and then requesting a "stop out." The trial court overruled the objection.

In his closing argument, Long urged the trial court to grant his motion to suppress on the ground that Investigator Drury lacked a reasonable, articulable suspicion to conduct an investigatory stop. Specifically, Long claimed that Investigator Drury acted upon a mere hunch of criminal activity and that his call to dispatch was unsupported by a reasonable suspicion that the occupants of

the Durango were engaged in any criminal activity. He also argued that, even assuming Investigator Drury had a reasonable, articulable suspicion of criminal activity, Drury's knowledge could not be imputed to Deputy Simms under the "collective knowledge" doctrine. Long claimed that the collective knowledge doctrine did not permit the trial court to impute Investigator Drury's knowledge to Deputy Simms because Investigator Drury did not sufficiently communicate the facts he relied upon in requesting a "stop out." In addition, Long asserted that the collective knowledge doctrine could not be used to justify the stop because Deputy Simms exceeded the scope of the instructions given to him by Investigator Drury. He argued that Investigator Drury intended for the responding officer to initiate a consensual encounter because he was "not saying go stop them," but rather "[j]ust go up consensually and see what they're doing," so the trial court could not use the collective knowledge doctrine to justify an action beyond the scope of Investigator Drury's instructions and "make it bigger than what it is." The trial court rejected these arguments and denied the motion to suppress. Long subsequently entered into a conditional guilty plea, which preserved his right to appeal the denial of his motion to suppress. This appeal followed.

II. ANALYSIS

A. Investigator Drury's Testimony at the Suppression Hearing

In his first assignment of error, Long argues that the trial court "erred in allowing Investigator Drury to testify about information he obtained from informants over the defense's objection." Specifically, he contends that the trial court erred in allowing Investigator Drury to testify about the statements C.E. made to him prior to and during the phone call on the evening of February 8, 2018. In his brief to this Court, citing Giles v. Commonwealth, 32 Va. App. 519 (2000), Long argues that "[t]o provide reasonable suspicion, either the informant or the information given must exhibit 'sufficient indicia of reliability.'" He claims that in this case, "there is

- 6 -

insufficient independent corroboration of the information provided by the informant," and, therefore, "the information is unreliable and should have been deemed inadmissible."

Long's argument that the information obtained from C.E. should have been deemed inadmissible because it was unreliable is based on a flawed premise. In Giles, this Court addressed the question of whether an informant's tip could provide sufficient evidence of a reasonable, articulable suspicion to justify an investigatory stop. Giles, 32 Va. App. at 523. The Court concluded that "[t]o provide reasonable suspicion, either the informant or the information given must exhibit 'sufficient indicia of reliability.'" Id. (quoting Alabama v. White, 496 U.S. 325, 326-27 (1990)). As the quoted excerpt from Giles makes clear, information obtained from an informant must be reliable to be *sufficient* to establish a reasonable, articulable suspicion of criminal activity. See id. The Court in Giles did not hold that information obtained from an informant must be reliable to be even *admissible* at a suppression hearing. Therefore, Long's reliance on Giles is misplaced. Any doubt as to the reliability of the statements C.E. made to Investigator Drury raises an issue of the weight to be given those statements by the finder of fact – not an issue of admissibility. See, e.g., Sandoval v. Commonwealth, 20 Va. App. 133, 138 (1995) ("The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented.").

In addition, the record before us leaves no doubt that the information Investigator Drury obtained from C.E. was, in fact, reliable. Investigator Drury began working with C.E. approximately "a month or so" before the phone call on February 8 – which distinguishes C.E. from an unknown, anonymous tipster. Furthermore, Drury independently corroborated the information he obtained from C.E. through his own observations and through his experience working on the task force's investigations. For example, he was aware at the time of the phone call that C.E. regularly tracked the Honda Civic's location by using the GPS tracking device she had installed in the

vehicle. He knew that she purchased and installed this device based on her suspicion that Jarrell was using the vehicle to facilitate illegal drug transactions. He had previously verified the vehicle location information provided by C.E. by reviewing toll records and toll video footage. He confirmed the license plate number that C.E. provided by verifying it through the Virginia DMV. Furthermore, after C.E.'s phone call on the night of February 8, 2018, he found the Honda Civic in the parking lot of the Travel Lodge on Bypass Road – the exact location where C.E. told him it would be. In addition, after C.E. reported that her daughter was in jail, that her car was missing, and that she suspected Jarrell was driving the vehicle, Investigator Drury recognized Jarrell sitting in the passenger's seat of the Durango parked next to the Honda Civic, with its driver's seat empty. Based on Investigator Drury's independent corroboration of the information he obtained from C.E. prior to and during the phone call on February 8, it is clear that the information provided by C.E. was, in fact, reliable.

For these reasons, we find no error in the trial court's decision to allow Investigator Drury to testify as to the information he obtained from C.E. during the phone call on February 8 and during the month-long working relationship they had developed prior to the February 8 call.

### B. Denial of Long's Motion to Suppress

Long next argues that the trial court "erred in overruling and denying Appellant's Motion to Suppress." First, he argues that Investigator Drury acted upon a mere hunch of criminal activity and that Drury's request for a "stop out" was unsupported by a particularized and objective basis for suspecting that the occupants of the Durango were engaged in any criminal activity. Second, he argues that, even assuming Investigator Drury had a reasonable, articulable suspicion, his knowledge could not be imputed to Deputy Simms under the "collective knowledge" doctrine.

"When challenging the denial of a motion to suppress evidence on appeal, the defendant bears the burden of establishing that reversible error occurred." Edmond v. Commonwealth, 66

Va. App. 490, 498 (2016). While we are bound to review *de novo* the ultimate questions of reasonable suspicion and probable cause, we "review findings of historical fact only for clear error[3] and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996) (footnote added).

### 1. Investigator Drury's Reasonable, Articulable Suspicion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "If a police officer has reasonable, articulable suspicion that a person is engaging in, or is about to engage in, criminal activity, the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and seizures." McGee v. Commonwealth, 25 Va. App. 193, 202 (1997) (*en banc*). A reasonable, articulable suspicion is "'a particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas, 517 U.S. at 696 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). However,

> "[t]here is no 'litmus test' for reasonable suspicion. Each instance of police conduct must be judged for reasonableness in light of the particular circumstances." Castaneda v. Commonwealth, 7 Va. App. 574, 580 (1992) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). "In order to determine what cause is sufficient to authorize police to stop a person, cognizance must be taken of the 'totality of the circumstances – the whole picture.'" Leeth [v. Commonwealth], 223 Va. [335,] 340 [(1982)] (citing United States v. Cortez, 449 U.S. 411, 417 (1981)).

Harmon v. Commonwealth, 15 Va. App. 440, 445 (1992).

In this case, the Commonwealth conceded that Deputy Simms effected a nonconsensual stop when he turned on his emergency lights and approached the passenger's side of the

---

[3] "In Virginia, questions of fact are binding on appeal unless 'plainly wrong.'" McGee v. Commonwealth, 25 Va. App. 193, 198 n.1 (1997) (*en banc*) (citations omitted).

Durango. Therefore, we must determine whether that stop was supported by a reasonable, articulable suspicion that the occupants of the Durango were engaging in, or were about to engage in, criminal activity.

Investigator Drury began working with C.E. approximately "a month or so" before the facts giving rise to this appeal. He knew that C.E. believed her daughter and Jarrell were involved in drug trafficking, he knew that C.E. had placed a GPS tracker on her Honda Civic, and he had previously verified the location of the Honda based on information obtained through C.E. by reviewing toll records and toll video footage. On the night of February 8, 2018, Drury learned from C.E. that her daughter – the only other lawful owner of the Honda – was in jail, but that the GPS showed the vehicle moving around Williamsburg. C.E. was upset that her car was being driven around and wanted her car back. C.E. reported that the vehicle had stopped in the parking lot of the Travel Lodge on Bypass Road, which is precisely where Investigator Drury found the vehicle. He recognized the occupant of the passenger's seat of the Durango as Jarrell based on DMV photos, LInX photos, and evidence obtained from the post-arrest debriefs that he had previously conducted in cases involving drug transactions. He also observed the driver's seat of the Honda Civic – the vehicle that was reported missing – empty, which further focused his suspicions on the occupants of the Durango parked next to it. Finally, as a veteran of the drug task force, Investigator Drury recognized the Travel Lodge as a high-crime location, which he testified that he had visited upwards of thirty times in his career in response to illegal drug transactions.

Based on this evidence, Investigator Drury justifiably requested that a uniformed, on-duty officer conduct a brief stop for the purpose of investigating whether the individuals in the parking lot were engaged in, or were about to engage in, any criminal activity. These specific and articulable facts provided far more than a hunch of criminal activity, whether in the form of

reasonable, articulable suspicion of unauthorized use of a motor vehicle or reasonable, articulable suspicion of an illegal drug transaction. While it is possible that C.E.'s daughter could have given Jarrell permission to drive the vehicle even while the daughter was in jail, and while her incarceration does not conclusively indicate that any such permission was necessarily revoked, "[r]easonable suspicion 'need not rule out the possibility of innocent conduct.'" Raab v. Commonwealth, 50 Va. App. 577, 581 (2007) (*en banc*) (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)). As the Supreme Court of Virginia has made clear, "the 'mere possibility of an innocent explanation' does not necessarily exclude a reasonable suspicion that criminal activity is afoot." Hill v. Commonwealth, 297 Va. 804, 815 (2019) (quoting Shifflett v. Commonwealth, 58 Va. App. 732, 736 (2011)). Investigator Drury's request for a stop was grounded in "a particularized and objective basis," supported by specific and articulable facts, for suspecting that criminal activity may have been afoot at the time of the stop. See Ornelas, 517 U.S. at 696. Considering all of these circumstances, each mounting upon the others, and "[v]iewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner, 268 Va. at 330, we hold that the trial court certainly did not err in concluding that Investigator Drury had a reasonable, articulable suspicion of criminal activity.

### 2. "Collective Knowledge" Doctrine

Having concluded that Investigator Drury possessed the requisite knowledge to conduct an investigatory stop, the lone remaining question is whether the trial court erred in determining that Investigator Drury's knowledge could be imputed to Deputy Simms. Long contends that the trial court erred in applying the collective knowledge doctrine in this case because Investigator Drury did not sufficiently communicate his basis of knowledge either to dispatch or to Deputy Simms when he requested a "stop out." In addition, Long argues that the collective knowledge doctrine does not

apply here because Investigator Drury intended for Deputy Simms to initiate a consensual encounter but Simms in fact effected a nonconsensual investigatory stop. Specifically, Long argues on brief that the collective knowledge doctrine "does not authorize an officer to do anything over and above the action that is specified by the directing officer" and that "[t]he Commonwealth is asking this Court to extend the scope of the Collective Knowledge Doctrine without presenting any authority to justify such an extension."

First, Long's argument that the stop of the Durango was unconstitutional because Investigator Drury did not sufficiently communicate his basis of knowledge is without merit.[4] In Edmond v. Commonwealth, 66 Va. App. 490 (2016), this Court applied the collective knowledge doctrine. Relying on the United States Supreme Court's decisions in Whiteley v. Warden, 401 U.S. 560 (1971), and United States v. Hensley, 469 U.S. 221 (1985), this Court held that "an officer is justified in acting upon an instruction from another officer if the instructing officer had sufficient information to justify taking such action himself." Edmond, 66 Va. App. at 503. We emphasized that "[b]y imputing the investigating officer's suspicions onto the responding officer, *without requiring the responding officer to independently weigh the reasonable suspicion analysis*, the collective knowledge doctrine preserves the propriety of the stop and avoids crippling restrictions on our law enforcement." Id. (alteration in original) (emphasis added) (quoting United States v. Lyons, 687 F.3d 754, 766 (6th Cir. 2012)).

As this Court made clear in Edmond, the application of the collective knowledge doctrine depends on the sufficiency of the knowledge possessed by the instructing officer – *not* on the sufficiency of the facts communicated between the officers. Therefore, we do not agree that

---

[4] In this case, Drury communicated his instruction through the York County Sheriff's Office dispatcher, who then relayed the instruction to Deputy Simms. Because Long does not argue that the dispatcher's involvement in relaying the request should render the collective knowledge doctrine inapplicable, we do not address this point.

Investigator Drury's limited communication of the facts upon which Drury relied in requesting a "stop out" is relevant to the question of whether his knowledge could be imputed to Deputy Simms under the collective knowledge doctrine. Accepting this argument by Long would require us to disregard the basic principle of *collective* knowledge – i.e., that one officer is entitled to rely upon the reasonable suspicions of his or her fellow officer in taking action pursuant to that other officer's instructions.

We are likewise unpersuaded by the argument that Investigator Drury's subjective intention for a consensual encounter should render the collective knowledge doctrine inapplicable, as "settled precedent governing Fourth Amendment cases has 'repeatedly rejected a subjective approach.'" Mason v. Commonwealth, 64 Va. App. 292, 301 (2015) (*en banc*) (quoting Fernandez v. California, 571 U.S. 292, 302 (2014)), aff'd, 291 Va. 362 (2016). Therefore, in a collective knowledge case such as this one, the subjective intention of the instructing officer does not determine our analysis of whether the responding officer acted appropriately under an objective standard of reasonableness. When the instructing officer possesses sufficient knowledge to take a particular action without violating the Fourth Amendment, and when that knowledge is imputed to the responding officer, the responding officer can take action to the full extent of the constitutional latitude afforded to the instructing officer – without being required to again weigh independently the sufficiency of the instructing officer's basis of knowledge. See Edmond, 66 Va. App. at 502-04; see also United States v. Ferebee, 957 F.3d 406, 411 (4th Cir. 2020) ("[T]he collective-knowledge doctrine simply directs us to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer . . . ." (alteration in original) (quoting United States v. Massenburg, 654 F.3d 480, 493 (4th Cir. 2011))) (emphasis omitted). Here, Investigator Drury's subjective intention for the encounter to be consensual is of no actual consequence to our analysis of whether Deputy Simms's stop of the Durango was reasonable. Because Investigator Drury possessed sufficient knowledge to

conduct a brief detention for the purpose of investigating his reasonable, articulable suspicion of potential criminal activity and because that knowledge was properly imputed to Deputy Simms under the collective knowledge doctrine, Deputy Simms was fully justified in acting upon that knowledge to effect a nonconsensual investigatory stop.[5]

In light of all of these circumstances, we hold that the trial court correctly determined that the collective knowledge doctrine could be applied in this case, and we find no error in the conclusion that Investigator Drury's reasonable, articulable suspicion could be imputed to Deputy Simms.

### III. CONCLUSION

In short, the trial court did not err in allowing Investigator Drury to testify about the statements C.E. made to him prior to and during the phone call on the evening of February 8, 2018. The statements were clearly reliable, as Investigator Drury independently corroborated the information from C.E. through his own observations and through his experience as a member of the regional drug task force. Even more significantly, any issue of reliability would go to the weight – not the admissibility – of this evidence. Consequently, the trial court did not err in allowing Investigator Drury to testify at the suppression hearing regarding the information he obtained from C.E. and his reasons for asking an on-duty officer to "stop out with the suspicious occupied vehicle" in the Travel Lodge parking lot.

---

[5] Moreover, we note also that Investigator Drury's instruction to "stop out with the suspicious occupied vehicle" would not necessarily reveal to a reasonable officer that Investigator Drury subjectively intended for this encounter to be consensual – as opposed to actually doing a stop of the vehicle as Deputy Simms did here. As Investigator Drury explained at the suppression hearing, "[I]n my mind – I don't know that I rela[ye]d this to dispatch thoroughly, but in my mind, I wanted them to make consensual contact with the suspicious occupied vehicle in the parking lot." Under an objective standard, given the words "stop out with the suspicious occupied vehicle," the very premise of Long's argument that Deputy Simms went beyond Investigator Drury's instructions is questionable.

Furthermore, we find no error in the trial court's decision to deny Long's motion to suppress because the physical evidence obtained by Deputy Simms was gathered following a lawful investigatory stop. Considering the totality of the circumstances, Investigator Drury had a reasonable, articulable suspicion that the occupants of the Durango may have been engaged in, or were about to engage in, criminal activity at the time of the stop. His suspicion was based on far more than a hunch of criminal activity. C.E. was very concerned that the vehicle she co-owned with her daughter, who was then in jail, was being driven around Williamsburg and possibly involved in drug transactions, and C.E. wanted her vehicle back. The reasonable, articulable suspicion that Investigator Drury and the police had here was supported by a particularized and objective basis for suspecting that unauthorized use of a motor vehicle or an illegal drug transaction – or both – may have been afoot at the time of the stop.

In addition, the trial court did not err in applying the collective knowledge doctrine to impute Investigator Drury's reasonable, articulable suspicion to Deputy Simms. Investigator Drury possessed sufficient knowledge to conduct an investigatory stop, and he was not required to communicate all the basis of his knowledge in order for his reasonable, articulable suspicion to be imputed to Deputy Simms under the collective knowledge doctrine. Furthermore, the fact that Investigator Drury subjectively intended for the responding officer to initiate a consensual encounter when he asked for a "stop out" has no bearing on the application of the collective knowledge doctrine to justify this particular stop, and the trial court properly disregarded Investigator Drury's subjective intentions in determining whether the stop was justified under an objective standard of reasonableness. Because Investigator Drury possessed the requisite knowledge to conduct a brief stop for the purpose of investigating potential criminal activity and because his knowledge was imputed to Deputy Simms, the trial court correctly concluded that Deputy Simms committed no

- 15 -

Fourth Amendment violation by effecting a nonconsensual stop that was supported by his fellow officer's reasonable, articulable suspicion.

For all of these reasons, we affirm the judgment of the circuit court.

<u>Affirmed.</u>